D. BRIAN McKAY, ATTORNEY GENERAL, STATE OF NEVADA, APPELLANT, v. KENNETH A. BERGSTEDT, RESPONDENT/CROSS-APPELLANT, v. REX A. BELL, DISTRICT ATTORNEY OF CLARK COUNTY, NEVADA, CROSS-RESPONDENT.

No. 21207

November 30, 1990

801 P.2d 617

*Donald H. Haight,* Deputy Attorney General, Las Vegas, for Appellant.

*Beckley, Singleton, DeLanoy, Jemison & List, Jack C. Cherry* and *Daniel F. Polsenberg,* Las Vegas, for Respondent/Cross-Appellant.

*Janson F. Stewart,* Chief Deputy District Attorney, Clark County, for Cross-Respondent.

810

## OPINION

By the Court, STEFFEN, J.:

Kenneth Bergstedt was a thirty-one-year-old mentally competent quadriplegic who sought to vindicate on appeal the lower court's decision confirming his right to die. Convinced that Kenneth's position has merit, we affirm.[1]

Prefatorily, we note that the State has essentially agreed with Kenneth's petition and has accordingly assumed only a token adversarial stance on appeal. Ordinarily, this court would deny appellate review to an appeal so lacking in controversy, especially where the intervening death of the petitioner forecloses the possibility of granting the relief sought. Nevertheless, we have concluded that the issues before us are of such importance to the citizens of this State that an appellate resolution is virtually

---

[1]Despite this court's efforts to expedite the disposition of this appeal, Kenneth did not survive the process. As a result, we have revised certain aspects of the opinion to reflect changes necessitated by what we consider to be the tragic and untimely demise of a young man who had managed to create a modicum of quality in a life devastated by quadriplegia and total dependence on artificial respiration and the care of others. We also note that Kenneth's fear of being left at the mercy of strangers would now present an added challenge to the struggle for quality in his life if he had survived, as his devoted and caring father passed away within a matter of days after Kenneth's death.

compelled. In that regard, our perception of duty is shared by other courts faced with issues of similar nature and magnitude in an appellate environment lacking in controversy and the existence of a live supplicant. The Supreme Court of Georgia, in State v. McAfee, 385 S.E.2d 651 (Ga. 1989), decided a case involving a ventilator-dependent quadriplegic under circumstances where the state concluded there was no basis for opposing McAfee's right to refuse treatment. In Matter of Farrell, 529 A.2d 404 (N.J. 1987), and Bartling v. Super. Ct. (Glendale Adven. Med.), 163 Cal.App.3d 186 (Cal.Ct.App. 1984), the courts concluded that the issues involving the right to die were of such extreme importance that appellate jurisdiction would be exercised despite the intervening death of appellants. For the reasons stated, we elect to review and decide the issues presented by this appeal.

## FACTUAL BACKGROUND

At the tender age of ten, Kenneth suffered the fate of a quadriplegic as the result of a swimming accident. Twenty-one years later, faced with what appeared to be the imminent death of his ill father, Kenneth decided that he wanted to be released from a life of paralysis held intact by the life-sustaining properties of a respirator. Although Kenneth was able to read, watch television, orally operate a computer, and occasionally receive limited enjoyment from wheelchair ambulation, he despaired over the prospect of life without the attentive care, companionship and love of his devoted father.

The limited record before us reflects substantial evidence of facts relevant to the proceedings below and material to the framework upon which the resolution of this appeal is constructed. First, a board-certified neurosurgeon determined that Kenneth's quadriplegia was irreversible. Second, a psychiatrist examined Kenneth and found him to be competent and able to understand the nature and consequences of his decision. Third, Kenneth arrived at his decision after substantial deliberation. Fourth, Kenneth's trusted and devoted father understood the basis for his son's decision and reluctantly approved. Fifth, although Kenneth's quadriplegia was irreversible, his affliction was nonterminal so long as he received artificial respiration.

Kenneth thus petitioned the district court as a non-terminal, competent, adult quadriplegic for an order permitting the removal of his respirator by one who could also administer a sedative and thereby relieve the pain that would otherwise precede his demise. Kenneth also sought an order of immunity from civil or criminal liability for anyone providing the requested assistance. Additionally, he petitioned the court for a declaration

absolving him of suicide in the removal of his life-support system.

In ruling, the district court determined that Kenneth was a mentally competent adult fully capable of deciding to forego continued life connected to a respirator. The court also found that he understood that the removal of his life-support system would shortly prove fatal.

In concluding that Kenneth had a constitutional privacy right to discontinue further medical treatment, the court also ruled that given Kenneth's condition, judicial recognition of the primacy of his individual rights posed no threat to the State's interest in preserving life, adversely affected no third parties, and presented no threat to the integrity of the medical profession. The district court thus concluded that Kenneth was entitled to the relief sought.

## DISCUSSION

### I

Our research revealed five cases involving decisions by competent adults to discontinue the use of life-support systems. Two of the five cases were brought by petitioners who were terminally ill. The other three actions, like the instant case, involved non-terminal, competent adults who were dependent upon artificial life support systems. Relief was granted in each of the five cases, albeit posthumously in two of the cases where petitioners had died before their appeals were decided.

One of the verities of human experience is that all life will eventually end in death. As the seasons of life progress through spring, summer and fall, to the winter of our years, the expression unknown to youth is often heard evincing the wish to one night pass away in the midst of a peaceful sleep. It would appear, however, that as the scientific community continues to increase human longevity and promote "the greying of America," prospects for slipping away during peaceful slumber are decreasing. And, for significant numbers of citizens like Kenneth, misfortune may rob life of much of its quality long before the onset of winter.

Because many individuals find themselves facing a terminal condition susceptible to indefinite suspension by medical intervention, the question arises with increasing frequency and fervor concerning the extent to which persons have the right to refuse an artificial extension of life. Courts considering the question have basically agreed that the answer is to be found in the balancing of interests between the person *in extremis* and the State. On the one hand is the interest of the individual in determining the extent to which he or she is willing to have a devastated life continued

artificially or by radical medical treatment. On the other hand, courts agree that the State has several interests of significance that must be weighed in determining whether the rights of the individual should prevail. Those interests have generally been defined as: (1) the interest of the State in preserving the sanctity of all life, including that of the particular patient involved in a given action; (2) the interest of the State in preventing suicide; (3) the interest of the State in protecting innocent third persons who may be adversely affected by the death of the party seeking relief; and (4) the State's interest in preserving the integrity of the medical profession. We add to the list of State interests, a fifth concern which is the interest of the State in encouraging the charitable and humane care of those whose lives may be artificially extended under conditions which have the prospect of providing at least a modicum of quality living.

Under the common law, "[n]o right is held more sacred, or is more carefully guarded . . . than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." Cruzan v. Director, Missouri Department of Health, ...... U.S. ......, 110 S.Ct. 2841, 2846 (1990) (quoting Union Pacific R. Co. v. Botsford, 141 U.S. 250, 251 (1891)). Continuing, the *Cruzan* court declared that "[t]his notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment." *Id.* The corollary embodied in the right of informed consent is the right to refuse the proffered medical treatment or regimen irrespective of consequences. *See Bartling,* 163 Cal.App.3d at 194. Obviously, if a patient is powerless to decline medical treatment upon being properly informed of its implications, the requirement of consent would be meaningless. We nevertheless agree with other courts which have held that the right to refuse medical treatment is not absolute. *See* Satz v. Perlmutter, 362 So.2d 160, 162 (Fla.App. 1978); *State v. McAfee,* 385 S.E.2d at 652; Cruzan, By Cruzan v. Harmon, 760 S.W.2d 408, 421 (Mo. 1988) (en banc); *Matter of Farrell,* 529 A.2d at 410. Courts have consistently balanced the fundamental right of the individual to refuse medical treatment against the four state interests enumerated above. *See, e.g.,* Bouvia v. Superior Court, 179 Cal.App.3d 1127 (Cal.Ct.App. 1986); *Bartling v. Super. Ct. (Glendale Adven. Med.),* 163 Cal.App.3d at 186; *Satz v. Perlmutter,* 362 So.2d at 160; *State v. McAfee,* 385 S.E.2d at 651; Superintendent of Belchertown v. Saikewicz, 370 N.E.2d 417 (Mass. 1977); *Cruzan, By Cruzan v. Harmon,* ...... U.S. ......, 110 S.Ct. at 2841; *Matter of Farrell,* 529 A.2d at 404.

Additionally, most courts considering issues involving the so-called right to die have held that individuals have a fundamental constitutional privacy right to withhold or withdraw medical treatment and support that would prolong the process of dying. *See, e.g.,* Rasmussen by Mitchell v. Fleming, 741 P.2d 674 (Ariz. 1987); *Bouvia v. Superior Court,* 179 Cal.App.3d at 1127; *Bartling v. Super. Ct. (Glendale Adven. Med.),* 163 Cal.App.3d at 186; In re Guardianship of Barry, 445 So.2d 365 (Fla.Dist. Ct.App. 1984); *Superintendent of Belchertown v. Saikewicz,* 370 N.E.2d at 417; Matter of Quinlan, 355 A.2d 647 (N.J. 1976); Matter of Welfare of Colyer, 660 P.2d 738 (Wash. 1983). We do not perceive a privacy right in either our federal or state constitution as a basis for refusing or withdrawing medical treatment and support. However, we do agree with the United States Supreme Court in *Cruzan* that a person's liberty interest is the fundamental constitutional value implicated in "right to die" cases. *See Cruzan,* 110 S.Ct. at 2851 n.7. Indeed, the *Cruzan* court noted that "[t]he principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions." *Cruzan,* 110 S.Ct. at 2851. Article 1, section 8 of the Constitution of the State of Nevada tracks the Fourteenth Amendment of the United States Constitution in protecting its citizens against deprivation of their right to liberty without due process of law. We conclude that Kenneth's liberty interest under both the federal and Nevada constitutions was implicated in his request to be relieved of his respirator.

The *Cruzan* court also noted that an individual's liberty interest in refusing medical treatment is not necessarily dispositive. Declaring that the inquiry does not end with the determination that a person has a liberty interest under the Due Process Clause, the Court held that "whether respondent's constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests." *Cruzan,* 110 S.Ct. at 2851-52 (quoting Youngberg v. Romeo, 457 U.S. 307, 321 (1982)). It is thus seen that under both the common law right to refuse treatment and an individual's constitutionally protected liberty interest, such rights are not absolute and are subject to a balancing of relevant State interests.

## II

Turning, as we must, to the legitimate interests of the State, we

now balance those interests against Kenneth's constitutional liberty interest and common law right of self-determination, and we do so for decisional purposes despite Kenneth's death.

1. *The interest of the State in preserving life.* The State's interest in preserving life is both fundamental and compelling. Indeed, it constitutes a basic purpose for which governments are formed. Nevertheless, the State's interest in the preservation of life is not absolute. For example, state-sponsored executions may constitute an exception to the duty to preserve life for a complex of reasons ranging from an emphasis on the value of the lives of innocent victims to the necessity of maintaining an orderly society where the quality of life is of preeminent concern. Moreover, as the quality of life diminishes because of physical deterioration, the State's interest in preserving life may correspondingly decrease. However, the State's attenuated interest does not evince a lesser appreciation for the value of life as the physical being deteriorates, but rather a recognition of the fact that all human life must eventually succumb to the aging process or to intervening events or conditions impacting the health of an individual. Moreover, an interest in the preservation of life "at all costs" is demeaning to death as a natural concomitant of life. Despite its frightening aspects, death has important values of its own. It may come as welcome relief to prolonged suffering. It may end the indignities associated with life bereft of self-determination and cognitive activity. In the mind of some, it may satisfy longings for loved ones preceding them in death. In short, death is a natural aspect of life that is not without value and dignity.

Courts have recognized that persons may reach a condition in life where the individual preference for a natural death may have greater primacy than the State's interest in preserving life through artificial support systems. Although we would have stated it differently, the court in Matter of Conroy, 486 A.2d 1209 (N.J. 1985), declared that "[i]n cases that do not involve the protection of the actual or potential life of someone other than the decision-maker, the state's indirect and abstract interest in preserving the life of the competent patient generally gives way to the patient's much stronger personal interest in directing the course of his own life." *Id.* at 1223. We do not view the State's interest in preserving the life of a competent patient as either abstract or indirect. It remains, in our view, not only compelling and fundamental, but focused and direct as well. The State's interest in preserving all human life, including that of the particular patient, should not be suspended or minimized under any conditions. We nevertheless agree with the court in *Satz v. Perlmutter* that "[t]here can be no

doubt that the State *does* have an interest in preserving life, but . . . 'there is a substantial distinction in the State's insistence that human life be saved where the affliction is curable, as opposed to the State interest where, as here, the issue is not whether, but when, for how long and at what cost to the individual [his] life may be briefly extended.'" *Perlmutter,* 362 So.2d at 162 (quoting from Superintendent of Belchertown v. Saikewicz, 370 N.E.2d 417, 425-26 (Mass. 1977)). In *Perlmutter,* however, the competent adult patient was terminally ill with a prognosis of a short remaining life even while connected to a respirator. Kenneth, of course, was not terminally ill despite his dependence on the respirator. The *Perlmutter* ruling is therefore of limited value to the instant case.

In both *Bouvia* and *Bartling* the adult patients were, as here, non-terminal and competent.[2] The *Bartling* court disposed of the right to die issue with little comment other than to recognize the preeminence of the patient's constitutional privacy right. We therefore do not regard *Bartling* as persuasive authority. *Bouvia,* however, discusses in some detail its justification for recognizing the petitioner's right to decide over the state's interest in preserving life. In pertinent part, the *Bouvia* court stated:

> At bench the trial court concluded that with sufficient feeding petitioner could live an additional 15 to 20 years; therefore, the preservation of petitioner's life for that period outweighed her right to decide. In so holding the trial court mistakenly attached undue importance to the *amount of time* possibly available to petitioner, and failed to give equal weight and consideration for the *quality* of that life; an equal, if not more significant, consideration.
>
> . . . .
>
> If her [Bouvia's] right to choose may not be exercised because there remains to her, in the opinion of a court, a physician or some committee, a certain arbitrary number of years, months, or days, her right will have lost its value and meaning.
>
> Who shall say what the minimum amount of available life must be? Does it matter if it be 15 to 20 years, 15 to 20 months, or 15 to 20 days, if such life has been physically destroyed and its quality, dignity and purpose gone? As in all matters lines must be drawn at some point, somewhere, but that decision must ultimately belong to the one whose life is in issue.

---

[2]Although the petitioner William Bartling was not diagnosed as terminal, he nevertheless expired before the hearing on his petition. His death was apparently due to natural causes.

Here Elizabeth Bouvia's decision to forego medical treatment or life-support through a mechanical means belongs to her. It is not a medical decision for her physicians to make. Neither is it a legal question whose soundness is to be resolved by lawyers or judges. It is not a conditional right subject to approval by ethics committees or courts of law. It is a moral and philosophical decision that, being a competent adult, is her's [sic] alone.

. . . .

We do not believe it is the policy of this State that all and every life must be preserved against the will of the sufferer. It is incongruous, if not monstrous, for medical practitioners to assert their right to preserve a life that someone else must live, or, more accurately, endure, for "15 to 20 years." We cannot conceive it to be the policy of this State to inflict such an ordeal upon anyone.

*Bouvia,* 179 Cal.App.2d at 1142-44.

Although we may have a difference of opinion over some of the statements quoted above from *Bouvia,* we do believe that at some point in the life of a competent adult patient, the present or prospective quality of life may be so dismal that the right of the individual to refuse treatment or elect a discontinuance of artificial life support must prevail over the interest of the State in preserving life. In instances where the prospects for a life of quality are smothered by physical pain and suffering, only the sufferer can determine the value of continuing mortality. We therefore conclude that in situations involving adults who are: (1) competent; (2) irreversibly sustained or subject to being sustained by artificial life support systems or some form of heroic, radical medical treatment; and (3) enduring physical and mental pain and suffering, the individual's right to decide will generally outweigh the State's interest in preserving life.

On the assumption that Kenneth would survive the issuance of this opinion, we reviewed his record carefully in an effort to sensitively analyze the circumstances under which he lived and the reasons that prompted him to seek a judicial imprimatur of his decision to disconnect his respirator. It appeared that Kenneth's suffering resulted more from his fear of the unknown than any source of physical pain. After more than two decades of life as a quadriplegic under the loving care of parents, Kenneth understandably feared for the quality of his life after the death of his

father, who was his only surviving parent.[3] Although Kenneth completed elementary and high school through private tutoring, study and telephone communication with his teachers, and wrote poetry and otherwise lived a useful and productive life, his physical condition was dire. His quadriplegia left him not only ventilator-dependent, but entirely reliant on others for his bodily functions and needs. His limited sources of entertainment, including reading, watching television and writing poetry through the oral operation of a computer, also required the attentive accommodations of others. Since the death of his mother in 1978, all of these services were provided by his father and attending nurses occasionally called to the home.

It thus appears, and the record so reflects, that Kenneth was preoccupied with fear over the quality of his life after the death of his father. He feared that some mishap would occur to his ventilator without anyone being present to correct it, and that he would suffer an agonizing death as a result. In contemplating his future under the care of strangers, Kenneth stated that he had no encouraging expectations from life, did not enjoy life, and was tired of suffering. Fear of the unknown is a common travail even among those of us who are not imprisoned by paralysis and a total dependency upon others. There is no doubt that Kenneth was plagued by a sense of foreboding concerning the quality of his life without his father.

Someone has suggested that there are few greater sources of fear in life than fear itself. In Kenneth's situation it is not difficult to understand why fear had such an overriding grasp on his view of the quality of his future life. Given the circumstances under which he labored to survive, we could not substitute our own judgment for Kenneth's when assessing the quality of his life. We therefore conclude that Kenneth's liberty interest in controlling the extent to which medical measures were used to continue to sustain his life and forestall his death outweighed the State's interest in preserving his life. As a competent adult beset by conditions noted above, Kenneth also enjoyed a preeminent right under the common law to withdraw his consent to a continued medical regimen involving his attachment to a respirator. In so ruling, we attach great significance to the quality of Kenneth's life as he perceived it under the particular circumstances that were afflicting him.

Notwithstanding our ruling on this issue, we note that if Kenneth had survived, our concerns under the fifth State interest

---

[3]Kenneth was adopted by Robert and Mildred Bergstedt shortly after his birth. Mildred died of cancer in 1978. Kenneth never attempted to discover the identity or whereabouts of his natural parents.

discussed hereafter, would have had to be satisfied prior to Kenneth's withdrawal of his life support system.

    2. *The interest of the State in preventing suicide.* Controversy continues to rage over this semantics-laden issue. Opponents of Kenneth's position describe it in terms of a state-sponsored suicide. Our research reveals no court declaring it so. We nevertheless recognize the controversy as a healthy concern for the value of an individual life.

    The dictionary definition of suicide is "the act or an instance of taking one's own life voluntarily and intentionally; the deliberate and intentional destruction of his own life by a person of years of discretion and of sound mind; one that commits or attempts self-murder." Webster's Third New International Dictionary (1968). As we will attempt to show, Kenneth harbored no intent to take his own life, voluntarily or otherwise. He did not seek his own destruction and he most certainly eschewed self-murder, a fact made evident by his petition to the district court for an order declaring that the exercise of his right to decide would not amount to an act of suicide.

    It is beyond cavil in one sense, that Kenneth was taking affirmative measures to hasten his own death. It is equally clear that if Kenneth had enjoyed sound physical health, but had viewed life as unbearably miserable because of his mental state, his liberty interest would provide no basis for asserting a right to terminate his life with or without the assistance of other persons. Our societal regard for the value of an individual life, as reflected in our federal and state constitutions, would never countenance an assertion of liberty over life under such circumstances.

    It must nevertheless be conceded, as noted above, that death is a natural end of living. There are times when its beckoning is sweet and benevolent. Most would consider it unthinkable to force one who is wracked with advanced, terminal, painful cancer to require a therapy regimen that would merely prolong the agony of dying for a brief season. In allowing such a patient to refuse therapy could it seriously be argued that he or she is committing an act of suicide?

    The informed consent doctrine presupposes that persons faced with difficult medical decisions that will, at best, substantially alter the quality of their future lives, may elect to refuse treatment and let the processes of nature take their course. Few would conclude that exercising the right to refuse treatment would be tantamount to suicide. Such persons have not sought to contract the disease or condition that threatens both the quality and duration of their lives. Rather, they have evaluated their circumstances and determined that a future sustained by radical medical

treatment or artificial means and entailing a drastic decrease in the quality of their lives, is not a valued alternative despite its effectiveness in extending life or delaying death. Moreover, we see no difference between the patient who refuses treatment and the one who accepts treatment and later refuses its continuance because of a resulting loss in the quality of life.

The primary factors that distinguish Kenneth's type of case from that of a person desiring suicide are attitude, physical condition and prognosis. Unlike a person bent on suicide, Kenneth sought no affirmative measures to terminate his life; he desired only to eliminate the artificial barriers standing between him and the natural processes of life and death that would otherwise ensue with someone in his physical condition. Kenneth survived artificially within a paralytic prison from which there was no hope of release other than death. But he asked no one to shorten the term of his natural life free of the respirator. He sought no fatal potions to end life or hurry death. In other words, Kenneth desired the right to die a natural death unimpeded by scientific contrivances.

Justice Scalia's concurring opinion in *Cruzan* suggests that "insofar as balancing the relative interests of the State and the individual is concerned, there is nothing distinctive about accepting death through the refusal of 'medical treatment,' as opposed to accepting it through the refusal of food, or through the failure to shut off the engine and get out of the car after parking in one's garage after work." *Cruzan*, 110 S.Ct. at 2862. We respectfully disagree with the learned justice. The distinction between refusing medical treatment and the other scenarios presented by Justice Scalia is the difference between choosing a natural death summoned by an uninvited illness or calamity and deliberately seeking to terminate one's life by resorting to death-inducing measures unrelated to the natural process of dying.

Impliedly, Justice Scalia's last two hypotheticals involved persons who were ambulatory and able to survive without artificial intervention. If they were physically healthy, society's respect for human life demanded that the State prevent, if possible, their deaths by suicide. There was no need to present either person with life-extending medical options, and both enjoyed the prospect of mental rehabilitation that might restore the will to live. There is a significant distinction between an individual faced with artificial survival resulting from heroic medical intervention and an individual, otherwise healthy or capable of sustaining life without artificial support who simply desires to end his or her life. The former adult, if competent, exercises a judgment based upon an assessment of the quality of an artificially maintained life

vis-a-vis the quality of a natural death. Conversely, the latter acts from a potentially reversible pessimism or mental attitude concerning only the quality of life.

We are not deciding competing interests between a nonexistent right to choose suicide and the interest of the State in preserving life. The State's interest in the preservation of life relates to meaningful life. Insofar as this State's interest is concerned, the State has no overriding interest in interfering with the natural processes of dying among citizens whose lives are irreparably devastated by injury or illness to the point where life may be sustained only by contrivance or radical intervention. In situations such as Kenneth's, only the competent adult patient can determine the extent to which his or her artificially extended life has meaning and value in excess of the death value.

Other courts have consistently agreed that rejecting treatment in the form of artificial life-support systems is not a euphemistic exercise in suicide. *See, e.g., Bouvia v. Superior Court,* 179 Cal.App.2d at 1144; *Bartling v. Superior Court,* 163 Cal.App.3d at 196; Foody v. Manchester Memorial Hosp., 482 A.2d 713, 720 (Conn.Super.Ct. 1984); *Satz v. Perlmutter,* 362 So.2d at 162-63; *State v. McAfee,* 385 S.E.2d at 652 (by implication); Brophy v. New England Sinai Hosp., 497 N.E.2d 626, 638 (Mass. 1986); *Matter of Farrell,* 529 A.2d at 411; Matter of Storar, 420 N.E.2d 64, 71 (N.Y. 1981); Leach v. Akron General Medical Center, 426 N.E.2d 809, 815 (Ohio Com.Pl. 1980); Matter of Welfare of Colyer, 660 P.2d 738, 743 (Wash. 1983). However, we do not necessarily agree with the analysis of other courts on the subject. For example, the court in *Bouvia* concluded that "the trial court seriously erred by basing its decision on the 'motives' behind Elizabeth Bouvia's decision to exercise her rights. If a right exists, it matters not what 'motivates' its exercise." *Bouvia,* 179 Cal.App.3d at 1145. In the first place, as we have already seen, the "right" is not absolute. It must be balanced against the previously enumerated interests of the State. Secondly, because the State has an interest in both preserving life and preventing suicide, the circumstances under which the individual seeks to exercise his liberty interest or common law right of refusal must be considered. Part of the complex of circumstances to be considered relates to the attitude or motive of the patient. To a large extent, a patient's attitude or motive may be judged from such factors as severity of physical condition, diagnosis, prognosis, and quality of life. If a competent adult is beset

with an irreversible condition such as quadriplegia, where life must be sustained artificially and under circumstances of total dependence, the adult's attitude or motive may be presumed not to be suicidal. In our view, there is a substantial difference between the attitude of a person desiring non-interference with the natural consequences of his or her condition and the individual who desires to terminate his or her life by some deadly means either self-inflicted or through the agency of another.

As medical science continues to develop methods of prolonging life, it is not inconceivable that a person could be faced with any number of alternatives that would delay death and consign him or her to a living hell in which there is hopelessness, total dependence, a complete lack of dignity, and an ongoing cost that would impoverish loved ones. The State's interest in preserving life and preventing what some may erroneously refer to as suicide does not extend so far.

Kenneth did not wish to commit suicide. He desired only to live for as long as the state of his health would permit without artificial augmentation and support. Society had no right to force upon him the obligation to remain alive under conditions that he considered to be anathema. To rule otherwise would place an unwarranted premium on survival at the expense of human dignity, quality of life, and the value that comes from allowing death a natural and timely entrance.

By way of summary on this point, we agree with the expression of the New Jersey Supreme Court reaffirmed in *Matter of Farrell* to the effect that "declining life sustaining medical treatment may not properly be viewed as an attempt to commit suicide. Refusing medical intervention merely allows the disease [or effects of an injury] to take its [their] natural course; if death were to eventually occur, it would be the result, primarily of the underlying disease [injury], and not the result of a self-inflicted injury." *Matter of Farrell,* 529 A.2d at 411 (quoting Matter of Conroy, 486 A.2d 1209, 1224 (N.J. 1985)).

3. *The interest of the State in protecting innocent third persons.* Kenneth never married and had no children. No third persons were dependent upon him financially or for comfort, support and counsel. It is true that Kenneth's father still lived at the time of Kenneth's petition, but it was realistically anticipated that the father would not survive for any extended period of time. Moreover, Robert Bergstedt acquiesced in his son's decision given the circumstances Kenneth was facing. This State interest was simply not implicated in Kenneth's request.

824

4.  *The State's interest in preserving the integrity of the medical profession.* In *Matter of Farrell,* the competent adult patient was a thirty-seven-year-old woman who was terminally ill with amyothrophic lateral sclerosis (Lou Gehrig's disease). Although Kathleen Farrell died before her appeal was decided, the *Farrell* court nevertheless determined that "medical ethics create no tension in this case. Our review of well-established medical authorities finds them in unanimous support of the right of a competent and informed patient such as Mrs. Farrell to decline medical treatment." *Matter of Farrell,* 529 A.2d at 411-12 (discussing authorities). We deem it unnecessary to quote from medical authorities to further support the conclusion reached in *Farrell.* The State has an unquestioned duty to see that the integrity of the medical profession is preserved and that it is never allowed to become an instrument for the selective destruction of lives deemed to have little utility.

Despite the medical profession's healing objectives, there are increasing numbers of people who fall in the category of those who may never be healed but whose lives may be extended by heroic measures. Unfortunately, there are times when such efforts will do little or nothing more than delay death in a bodily environment essentially bereft of quality. Under such conditions or the reasonably likely prospect thereof, the medical profession is not threatened by a competent adult's refusal of life-extending treatment. The President's Commission, established by Congress in 1978, and consisting of doctors, ethicists, lawyers, theologians and others, concluded:

> The voluntary choice of a competent and informed patient should determine whether or not life-sustaining therapy will be undertaken, just as such choices provide the basis for other decisions about medical treatment. Health care institutions and professionals should try to enhance patients' abilities to make decisions on their own behalf and to promote understanding of the available treatment options. . . . Health care professionals serve patients best by maintaining a presumption in favor of sustaining life, while recognizing that competent patients are entitled to choose to forego any treatments, including those that sustain life.

*President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Deciding to Forego Life-Sustaining Treatment,* p. 3 (U.S. Gov't Printing Office 1983); *see* 42 U.S.C. § 300v (1982).

We are of the opinion that Kenneth's request to be relieved of his connection to a respirator did not present an ethical threat to

the medical profession. Because a competent adult would have enjoyed a qualified constitutional and common law right to refuse a life-sustaining attachment to a respirator in the first instance, there is no reason why such an adult could not assert the same rights to reject a continuation of respirator-dependency that has proven too burdensome to endure.

5. *The State's interest in encouraging the charitable and humane care of afflicted persons.* There is a clear national and State public policy to encourage charitable contributions for the humane care and treatment of citizens stricken with various maladies and disabilities. The policy is reflected nationally by allowing deductions from the federal income tax for charitable contributions. It is also reflected throughout our society by committing scarce public assets to the funding of special legislation designed to create opportunities and facilities for physically handicapped persons. Both the purpose and effect of such legislation is to enhance the quality of life among those who are disabled in one form or another. Moreover, national and State efforts to improve the circumstances of disabled citizens are indicative of the highest social character—a society attuned to the worth of an individual irrespective of physical or mental handicap.

Kenneth's condition and predicament directly implicated the State interest here considered. Kenneth was not without a meaningful life. His ability to give expression to his intellect by means of an orally operated computer, to learn, to enjoy reading and watching videos and television all reflected the possibility of a life imbued with a potential for significant quality and accomplishment. He nevertheless feared life in the care of strangers after the demise of an attentive and caring father. It appeared to us that Kenneth needed some type of assurance that society would not cast him adrift in a sea of indifference after his father's passing. Perhaps available governmental, private and charitable support systems would not have been adequate to provide Kenneth the assurance he needed to alleviate his fears. We nevertheless conclude that absent Kenneth's intervening death, it would have been necessary to fully inform him of the care alternatives that would have been available to him after his father's death or incapacity.

### III

We elected to review this matter despite Kenneth's death and the basic lack of a controversy in order to provide guidance to others who may find themselves in similar predicaments. In so doing, we are keenly mindful of the cost and delay Kenneth suffered in order to obtain a final ruling through the court system.

We agree with other courts that have concluded that persons in Kenneth's situation should not be subjected to such a burdensome process in attempting to exercise their constitutional and common law right of choice. As evidenced by the instant case and those reported in other jurisdictions, if the process involved in validating a patient's election to refuse or terminate medical treatment is unduly protracted, the patient's rights become hollow and meaningless, if not entirely ineffectual.

After studying the procedural methodology employed or discussed by the courts in the cited opinions we felt somewhat like the dinner guest who enjoyed the meal but left with an unsatiated appetite. As noted previously, other courts have agreed that a patient's right to refuse medical treatment must be weighed against the State interests we have heretofore enumerated. Unfortunately, none of the courts has provided guidance as to how and by whom the weighing process is to be accomplished. Even the well-conceived procedure adopted by the New Jersey Supreme Court in *Matter of Farrell* is silent as to the methodology involved in an authoritative weighing process.[4] The procedural lacuna

---

[4]In *Farrell,* the court indicated that it would "define *who* may make such a decision [to withdraw life-sustaining medical treatment] and *how* it may be made." 529 A.2d at 408 (emphasis added). Later in the opinion, the court held that after the assessments concerning competency, prognosis, alternative treatments, the risk associated with the withdrawal of life-sustaining treatment, and the presence or absence of voluntary choice or coercion have been made by two non-attending physicians, "the patient's right to choose to disconnect the life-sustaining apparatus *must be balanced against the four potentially countervailing state interests. . . .*" 529 A.2d at 413 (emphasis supplied). Unfortunately, the court failed to identify who would be authorized to conduct the balancing process. Although the court placed emphasis on the importance of the decision of the patient and his family, it is clear that the court did not intend that the patient or family engage in the process of weighing the State interests against their own. Moreover, the *Farrell* court emphasized that the procedure outlined in the opinion did not contemplate the involvement of the judicial system. *See* 529 A.2d at 415. In brief, the court required a balancing of individual and State interests as a condition to an authoritative decision concerning the patient's right to withdraw life-sustaining treatment, but failed to identify either how the process was to occur or who had the authority to decide which of the potentially competing interests would prevail.

Similarly, in both *Bouvia* and *Bartling* the courts determined that the judiciary was not to be involved in the decisional process, but failed to identify who would have the responsibility or authority to accomplish the balancing process concerning individual vis-a-vis State interests, and reach an authoritative determination. Again, it would make no sense to determine that State interests may be weighed against the rights of the individual by the very patient who is seeking to implement his or her own decision to refuse or terminate medical treatment.

The *McAfee* and *Perlmutter* courts both performed the balancing of the interests between the individual patient and the State, but did not provide any form of non-judicial procedure for satisfying the balancing process.

common to these opinions may reflect a judicial timidity resulting from a tacit recognition of the legislative hue court-supplied procedures would assume. It seems clear that the specification of measures involved in properly weighing the interests of the individual and the State is more suited to a statutory resolution by the Legislature.

Given the fact that our ruling has confirmed the rights of the individual and the interests of the State, and the need to weigh both in the decisional process, we feel constrained to suggest a procedural matrix by which the weighing and decisional process may be satisfied pending statutory treatment by the Legislature. We therefore stress that the following procedure is designed to fill a temporary void which we trust will be supplanted by timely legislative action. We also emphasize that until such time as the Legislature enacts superseding legislation, the procedure established here will suffice in the determination of a competent adult patient's right to refuse or discontinue medical treatment, including the use or discontinuance of life support systems.

Guided in part by the decisions of courts in other jurisdictions, and in particular that of the New Jersey Supreme Court in *Matter of Farrell*, we conclude that hereafter competent adult patients desiring to refuse or discontinue medical treatment need only conform to the following procedure:[5] (1) Two non-attending physicians must examine the adult to determine and certify in writing, without liability except for fraud,[6] that (a) the patient is mentally competent to understand his or her prognosis and was properly informed thereof, and that the patient was apprised of

---

[5]Obviously, Kenneth's case presents only issues involving competing interests and procedures relating to competent adults. Although this ruling does not involve a terminally ill, competent adult it will nevertheless apply to such persons since their predicament implicates no additional or different rights and would impact the countervailing State interests to an even lesser degree than in cases such as Kenneth's where the competent adult patient is not terminally ill. Issues relating to juveniles and incompetent adults afflicted by catastrophic illness or injury are not affected by this opinion and must, in the absence of legislation applicable to their situations, either await additional legislation or an appropriate case filed in the judicial system.

[6]It is the clear intention and office of this opinion to encourage responsible physicians and health care providers to assist patients in the proper exercise of their constitutional and common law rights by eliminating the possibility of criminal or civil liability for all such persons who, in good faith, involve themselves in the procedures outlined in the opinion. The single exception relating to fraud shall be of effect only in the event any such person deliberately seeks to accomplish a termination of life for unlawful reasons. Moreover, any claim of fraud must be supported by clear and convincing evidence.

treatment alternatives and the consequences that will or are likely to result from refusing medical treatment or electing to withdraw medical therapy, including life-support systems then in use; (b) the patient's condition is irreversible or the extent to which the condition may be improved through medical intervention; (c) the patient is or reasonably appears to be free of coercion or pressure in making his or her decision; (d) if the patient is non-terminal, i.e., has an estimated life expectancy of six months or more either with or without artificial life-support systems, that he or she was apprised of the care options available to the patient through governmental, charitable and private sources with due regard for the value of life, and certify in writing without liability except for fraud, that the aforesaid explanation of care alternatives was given and the patient's response thereto; (2) After the preceding steps have been satisfied, if the patient chooses to refuse medical treatment or to withdraw existing medical therapy, including life-support systems, one of the following alternatives will apply: (a) if the patient is terminally ill or injured, i.e., has an estimated remaining natural life expectancy (with or without artificial life-support systems) of less than six months and the two non-attending physicians so certify in writing (again, without liability except for fraud), the patient's constitutional and common law rights of self-determination shall be deemed to prevail over the previously enumerated State interests, and the patient may refuse treatment or elect to have existing therapy, including any life-support systems, terminated and any physician or health care provider[7] who assists the patient in the implementation of his or her decision, including the administration of any sedative or pain medication to ease the patient's pre-death anxieties or pain, will not be subject to civil or criminal liability; (b) if the patient is non-terminal, either by virtue or artificial life-support systems or a prognosis for a natural survival period in excess of six months, then the patient's decision to refuse treatment or to withdraw existing medical therapy, including life-support systems, must be weighed against the aforesaid State interests; the weighing process, pending legislative action, shall be performed by any district court judge, whose decision, with due regard for the patient's rights and the certifications of the physicians described above, will be final and not subject to appeal unless the district court judge shall determine that the interests of the State outweigh the patient's rights to refuse or terminate medical treatment. In the latter event, the patient shall enjoy a right of an expedited appeal in the event he or she elects to pursue it.

---

[7] Whenever the term ''health care provider'' appears in this opinion it shall refer to any medically trained person who is licensed to provide medical care and to prescribe and dispense controlled, legal medications.

In all cases decided by a district court in favor of the patient, the court's order shall specify that any physician or health care provider who assists the patient in receiving the benefits of his or her decision with minimal pain, shall not be subject to civil or criminal liability. In the latter regard, we agree with the court in *State v. McAfee* that a patient's "right to be free from pain at the time the ventilator [or other life support system] is disconnected is inseparable from his right to refuse medical treatment." *State v. McAfee,* 385 S.E.2d at 652.

In those cases classified above as terminal, the written certifications provided by the two non-attending physicians shall have the same force and effect as the order of a district court. The original of the written certifications by the physicians shall be provided to the patient as an authoritative basis for enlisting necessary assistance in accommodating the patient's decision. Any physician or health care provider who assists the patient and administers medication to minimize pain, shall enjoy the same immunity from civil or criminal liability as any such person who acted pursuant to an order of the district court. The non-attending physicians providing the certificates should retain a copy thereof in their own files.

We have burdened this opinion with the procedures set forth above in an attempt to eliminate uncertainty and minimize cost in these types of cases. We trust that our ruling will also provide a reasonably simple and expeditious method for facilitating a competent patient's decisions, while at the same time emphasizing the value of a human life and the seriousness with which these difficult and sensitive matters should be approached.[8]

---

[8]We are in accord with those courts that have concluded that a patient's rights should be considered and given effect outside the judicial system. As we have previously noted, the three courts we have cited in favor of such a proposition did not provide procedural machinery for accomplishing a balancing of the patient's rights and the State's interests exclusive of the court system. Were it not within the peculiar province of the Legislature to define such procedure by statute, we would have undertaken the task.

By way of illustration only, the Legislature could determine that a designee of the Director of the Nevada Department of Human Resources could provide non-terminal patients with a complete apprisal of the health care alternatives available to such patients instead of burdening the two non-attending physicians with that responsibility. Moreover, the Legislature could select someone such as a Deputy Attorney General designated by the Attorney General to perform the responsibility of weighing the rights of the patient and the interests of the State. Such a procedure could be final and incontestable unless the Deputy ruled in favor of the State, in which case a right of judicial review could be provided to the patient.

We would not presume to suggest to the Legislature the method best suited

## IV

If Kenneth had survived the date of the issuance of this opinion, we would have confirmed his right to discontinue his artificial life-support systems subject only to a prior consultation with a responsible health care provider or representative of the Nevada Department of Human Resources who would have informed him of the care alternatives available to him after his father's death. The value of Kenneth's life demanded nothing less.[9]

In view of Kenneth's death, we leave him with an official ruling that his petition to be humanely relieved of the artificial contrivance to which he was attached did not constitute a prelude to suicide. As a competent adult, Kenneth sought to exercise, through lawful means, his valued constitutional and common law right to allow the natural consequences of his condition to occur—unimpeded by artificial barriers. His memory is deserving of no taint or inference relating to an act of suicide.

For the reasons set forth above, the judgment of the district court is affirmed.[10]

YOUNG, C. J., and ROSE, J., concur.

---

to accomplish the procedural requirements necessary to balancing the rights of the individual patient vis-a-vis the State. We merely supply the above illustration to demonstrate the type of approach the Legislature could take in order to satisfy the demands of due process in this difficult and sensitive area. In any event, we sincerely urge the Legislature to timely enact legislation that will provide a sound, expeditious and inexpensive procedure for individuals faced with circumstances similar to Kenneth's.

Finally, until the Legislature acts, we would expect our district courts to assign a priority status to these types of cases. We would also trust that patients who are not in a position to bear the burden of attorney's fees, could contact the Nevada State Bar and be referred to attorneys who would be willing to handle these cases on a pro bono basis. Also, to the extent permitted by law, petitions seeking to vindicate a patients' right to refuse or terminate medical treatment should be accepted for filing without imposition of filing fees.

[9]We have read with dismay editorials that pressed for an expedited accommodation of Kenneth's desire to disconnect his respirator. We would have much preferred reading expressions of concern for the value of Kenneth's life and the various sources of organizational support that might have been explored in an effort to provide Kenneth with incentives to live. We trust that Kenneth did not conclude from such editorials that his life was without value or purpose or that meaningful alternatives to the disconnecting of his respirator did not exist. Finally, we regret not being able to inform Kenneth and his father that this court has done everything possible to responsibly expedite the disposition of this appeal notwithstanding its extreme importance to both Kenneth and the citizens of Nevada.

[10]Given the court's disposition of this matter, we have deemed it unnecessary to decide the issues raised by the cross-appeal.

MOWBRAY, J., concurring in part:

I concur in the result of the majority opinion only.

The bottom line is whether the district judge in the court below ruled correctly in permitting Kenneth to leave his life-sustaining ventilator, knowing that his death would most probably follow and, secondly, permitting the administration of medication to Kenneth to ease Kenneth's expected demise. The district judge did rule correctly on both issues, and therefore the judgment below should be affirmed.

The majority opinion goes on to establish a procedure for the disposition of these life termination cases. The majority places the ultimate and final life or death decision in a group of doctors characterized as "non-attending physicians." This proposed procedure will have a far reaching effect.

While the members of the medical profession subscribed to and are governed by the Hippocratic oath, which is predicated on the preservation of life, the establishment by judicial fiat of a convenient cadre of colleagues who would be on tap as "non-attending physicians" to decree the death of a fellow citizen without relevant standards and safeguards concerns me.

I would leave the establishment of such a procedure to the people acting through the wisdom of their representatives in the legislature.

SPRINGER, J., dissenting:

I dissent on two grounds. The first ground is that there was no real case or controversy before the district court. Therefore, it had no judicial power to decide that Kenneth Bergstedt could lawfully take his own life or that another person could lawfully assist him in taking his life. The second ground is that even if this had been a true case instead of a show case, it would not be a proper exercise of judicial power for a court to authorize one person to take the life of another person.

## I.

### *Absence of Judicial Power*

Article 6, section 6 of the Nevada Constitution gives to the district court the power to decide "cases." This is not a case. A case is defined as a "controversy, at law or in equity; a question contested before a court of justice."[1] As this court has put it, the exercise of judicial power must be "confined to controversies in the true sense. The parties must be adverse . . . ."[2] There is no

[1] Black's Law Dictionary 195 (5th ed. 1979).

[2] City of North Las Vegas v. Cluff, 85 Nev. 200, 201, 452 P.2d 461, 462 (1969).

controversy here. The state's attorney even went so far as to tell the trial court that "there does not appear to be any controversy between the attorney general's office and Mr. Bergstedt." I do not want to belabor the point because it is so obvious. There has never been any controversy here and no "question contested before a court of justice" because at all times, even on appeal, everyone has been in cordial agreement as to what the outcome was going to be.

Not only did the nonadversarial, nonantagonistic posture of this case deprive the trial court of its constitutional power to decide the claims presented by Mr. Bergstedt, it deprived the court of the truth-seeking benefits ordinarily attached to the adversary system. This is an agonizingly difficult case and a unique one, a case desperately in need of a two-sided debate. If there had been a life-side versus a death-side to this case, surely the life-side would at least have raised the point that the plaintiff's case must fail because it sought court approval of a "killing act," an act which knowingly caused the immediate death of a human being. As I indicate below, this would have been a strong argument to be made under the circumstances of this case. I know of no court that has adopted a rule which sanctions suicide[3] by a conscious, competent and alert human being who was not dying and who was expressing a frank desire for immediate self-destruction.[4] There are a number of novel and perplexing ques-

---

[3]"Suicide" may at first seem like a harsh word to be using under these circumstances, but it is a necessary word and a word that cannot be avoided. The majority defines suicide as the "taking of one's own life voluntarily and intentionally." Mr. Bergstedt breathed for twenty-three years with mechanical assistance. Taking away the ventilator was taking away his life—a life that would have gone on indefinitely had he not made the conscious decision to *take* it away.

[4]The *Bouvia* case cited in the majority opinion came very close to outright judicial approval of suicide by a suffering but nonterminal, bedridden patient. One of the three justices of the California Court of Appeal who decided the *Bouvia* case candidly took the position that some undefined types of persons should be granted by the courts the right to commit suicide, abetted by the kind help of medical personnel who would kill the person in a manner that was as "quick and painless as possible." But what about the state's criminal law forbidding the aiding and abetting of suicide? This law was, according to Justice Compton, "archaic and inhumane," and apparently, to be ignored by the court. Although I disagree with Justice Compton's position (I think it is the legislature's business to change the statutory law of homicide if it is going to be changed.), I think the justice was correct in pointing out in *Bouvia* that in permitting a suffering paralytic to be starved to death at her own request, the majority justices did not come to grips with the suicidal nature of Elizabeth Bouvia's quite understandable death wish. As Justice Compton correctly declared: "Even the majority opinion here must necessarily 'dance' around the issue [of suicide]." I respectfully suggest that the majority is dancing around the issue in this case.

tions to be answered in this case. I certainly would have had an easier time in dealing with these questions if they had been properly and adversarily litigated in the court below.

The trial court did not have the constitutional power to decide a "noncontroversy" and then to take the action that it did; but even if this had been a real case, I maintain that the trial court had no power to sanction or facilitate by court decree Kenneth Bergstedt's announced plan to take his own life by means of the mortal killing act of taking away his breathing apparatus. The Nevada Supreme Court's affirmance of the district court's decree "may make it law, but it does not make it true."[5]

## II.

### *State-Assisted Suicide: Our "Clouded Ability to Assess the Suicidal Basis of Mr. Bergstedt's Request to Die"*

[V]alue judgments . . . about the worth of Mr. Bergstedt's life have clouded [the] ability to properly assess the suicidal basis for Mr. Bergstedt's request to die . . . .[6]

As I have already suggested, having the benefit of arguments on only one side of any controversy is a severe limitation upon decision-makers' ability to arrive at an informed and just decision. This limitation has in no small measure "clouded" the truth and the ability of almost everyone to "assess the suicidal basis of Mr. Bergstedt's request to die." Added to the "one-sidedness" of this case are other "clouding" factors that I think may well have affected its outcome: the extremely dramatic and sympathetic nature of Mr. Bergstedt's plea for mercy; faulty reliance on "right-to-die" cases which deal with the comatose and the terminally ill and have no application here; and, cloudiest of all, the flawed impression that persons whose lives depend on life-sustaining devices may kill themselves at will, merely by calling removal of essential-to-life machines a refusal to accept unwanted "medical treatment" or by calling their users' immediate and directly resultant demise a "natural death."

---

[5]New York v. Harris, 110 S.Ct. 1640, 1649 (1990) (Marshall, J., dissenting).

[6]This quote is taken from the *amicus curiae* brief written by Thomas J. Marzen, general counsel for the National Legal Center for the Medically Dependent and Disabled. Although his brief was rejected by the court because of its late filing, I refer to it in this dissent because it is the only argument to be found in this case that favors life instead of death. Mr. Marzen represents "a national organization of disabled individuals, with some 3000 active members," some of whom "depend on ventilators to breathe."

■

I see Kenneth Bergstedt's breathing device as being more than "medicine." It is true that the machine was introduced during a medical emergency by medical personnel. It is true also that medical and mechanical monitoring of the device must be continued and that medical personnel or paramedical personnel are required to fulfill the daily needs of persons in this kind of condition. Notwithstanding all of this, I cannot escape the conclusion that, after twenty-three years of living and breathing in this machine-aided manner, the whole process becomes something quite more than mere medical *treatment*. The mechanical breather becomes a new way of life for its user, and life cannot go on without it. Mr. Bergstedt lived at home. The "treatment" in any real sense is over; and just as heart pace-makers, artificial venous or arterial shunts, a variety of prosthetic devices and other such medically sponsored and introduced artifacts may *begin* as a medical treatment modality, the ventilator begins as a form of medical treatment but ends up as an integral part of its dependent user. Even if it is insisted that these things continue indefinitely to be considered as "treatment," they indeed become far, far more than just treatment after years and years of dependency on them.

When Kenneth Bergstedt asked the court to give legal sanction to the death-inducing act of disconnecting his breathing apparatus, he was not to my mind merely exercising his "right to be let alone,"[7] and his right to refuse unwanted medical treatment. Withdrawal of medicine or so-called "life support" may be a humane way of letting nature take its course in the lives of the near-dead or irreversibly comatose, but it is a different matter when withdrawal of these items is admitted to be the immediate and proximate cause of the death of a person who concededly is seeking to take his own life.

Use of the term "natural death" in this case is only a natural and understandable way of averting the excruciating truth. Bergstedt's explicit and express desire and intention was that of putting an immediate end to his own life. That is not what one would call a "natural death." There was nothing natural about Mr. Bergstedt's death; he killed himself. Masking this unpleasant but inescapable fact has the unfortunate result of masking the really hard question presented by this case, and that is this: If, when and how should a person in Kenneth Bergstedt's condition (or perhaps other comparable conditions) be given legal permission to have outside assistance in taking his own life, without the incurrence of civil or criminal liability by anyone involved in the

---

[7]Olmstead v. United States, 227 U.S. 438 (1928) (Brandeis, J.).

process? By avoiding the question, we avoid the answer; and by avoiding the answer, we invite future agonies suffered by persons like Mr. Bergstedt, who, in my view, was not given an acceptable solution to his plight. Mr. Bergstedt is dead now, and this may let us look at these cases in a more dispassionate way and address the problems presented by this case in a proper and rational manner.

Once again: In light of his expressed intentions and in view of the direct and active way in which he chose to end his own life, Mr. Bergstedt cannot be said to have died a "natural death." Mr. Bergstedt's "injuries, though perhaps permanent, have not incapacitated Mr. Bergstedt completely. He is not 'terminally ill' or otherwise close to death. His request to forego mechanical respiration has been made in a context suggesting that his intent may be suicidal . . . ."[8] Mr. Bergstedt was not dying, except in the sense that we are all dying, and he was not in the least danger of imminent death. He had been living steadily for over twenty-three years, breathing with the aid of a ventilator, until he reached a time in his life when he decided to die because, like most other suicides, life had become, temporarily at least, intolerable for him. The means by which he chose to take his own life was to have someone remove his breathing device during a time that he was sedated for the calculated purpose of bringing his life to a painless end. The result of the ventilator's removal, known to him and to everyone concerned, was immediate death. Withholding the ventilator was for this man not a withholding of medical treatment, it was the withholding of life itself.

If we reflect for a moment on the nature and use of this ventilator, it does not take long to see that the machine had become an integral part of Mr. Bergstedt's person and was not mere "treatment."

> Life support systems such as ventilators, electric wheelchairs, or other automated devices enhancing one's functions are *real extensions of the person,* and should be treated as such. Persons with disabilities use "artificial" supports as a matter of daily course, and find them vital to carrying on their productive lives. Mr. Bergstedt's ventilator should not be transformed into a form of extraordinary support because his father is in ill health and Mr. Bergstedt thus far has not received appropriate professional and peer assistance in coping with personal fears.[9]

(My emphasis.)

Kenneth Bergstedt did not want to die a "natural" death; he

---

[8] *Marzen,* p. 1.

[9] *Marzen,* p. 11.

wanted to die an immediate death. He sought an immediate death by means of disconnecting the "extension of his person" that had enabled him to live and breathe for the preceding twenty-three years. Construing the ventilator in this case as a "form of extraordinary support" that can be removed at will is a terrible and terrifying rationalization and, as well, a prejudicial treatment of Mr. Bergstedt because his assisted suicide was sanctioned and facilitated only because of his disabled condition.

> It is crucial that the court not put its judicial stamp of approval on negative stereotypes about disability. This would result if it were to allow the state to assist an individual to die only because he or she has a disability. Judicial decisions which are based upon societal prejudices merely reinforce those prejudices, making them even more difficult to eradicate.[10]

I register now my strong disapproval of our court's putting their "judicial stamp of approval" on allowing "the state to assist an individual to die only because he . . . has a disability." What other conditions, physical or mental, I ask myself, will be brought to the courts as grounds for judicially approved and assisted self-destruction? We now have a growing population of people who are alive but throughout history would have been dead. Some live under conditions under which many if not most of us would probably not want to survive; yet there are those who do survive and who continue to survive under the most trying of circumstances. The distinguishing aspect of the described persons is that, unlike most of us, they do not have, because of their paralytic condition, the power to bring their lives to an end, however intolerable their lives might become. They are trapped. Life is thrust upon them—*forced* upon them. If a person like Mr. Bergstedt comes to the courts saying, "I have come to the end of my rope; I cannot stand it any more; you must give me the means to end my own life in peace and in dignity"; it is difficult indeed to say "no." Unfortunately it does not belong to the judicial realm to say "yes." The judicial department of government is not the proper agency to address the novel and perplexing question presented here, namely, the question of under what, if any, circumstances should a right to state-assisted suicide be granted. Although not called upon to do so by the writing of this dissent, I have some more to say on the subject.

---

[10]Stradley, *Elizabeth Bouvia v. Riverside Hospital; Suicide, Euthanasia, Murder: The Line Blurs,* 15 Golden Gate Univ. L. Rev. 407, 424 (1985).

### III.

#### *A "Right" to State-Assisted Suicide?*

I know of no judicially created or other legal "right" to commit suicide or to have court-ordered assistance in carrying out one's self-destruction. Although suicide is not a crime in Nevada or in any other state, there is certainly a strong enough public policy against suicide to preclude the courts from assisting in its enactment. Further, it is most certainly a crime to conspire to commit suicide or to aid and abet a suicide. Our law of crimes is legislative, and no statutory crime should be abolished or absolved without legislative enactment or repeal.

The issues presented here, though unique in many respects, are only part of a whole array of social, ethical, theological and legal problems that have come to us through the advancements of medical science. Until very recently in our history this kind of predicament was, necessarily, not a matter that was subject to being dealt with by our law. We have here a man whose consciousness was entombed in a body immobile. Unlike most of the readers of this opinion, Mr. Bergstedt did not have the power to end his life by himself, no matter how tortured his life became. If I am not mistaken, the technical ability to keep a person with these kinds of injuries alive by means of mechanical respiration has not been available for much more than fifty years. When we are faced with protecting the interests and dignity of a person like Mr. Bergstedt, we are dealing with a problem completely unknown and probably unthinkable to the law throughout most of its history. Still, there is a history of suicide in the law and even a history of state-sanctioned suicide. This might be useful to us in thinking through the problem at hand.

Although ancient Greece and Rome opposed suicide, and sanctions were imposed on the properties of those who committed suicide, laws were enacted in both Greece and Rome which excused suicide under certain circumstances. These societies provided for access to the courts for the purpose of hearing the applications of persons who were desirous of quitting life; and the courts could grant or refuse permission in each case as they saw fit. In the margin I have included a relatively modern commentary on this subject.[11] I bring this up only to show that in times past societies did grant state approval for certain kinds of self-

---

[11][Suicide] is an alternative which can at times be accepted by the individual with advantage to himself, the domestic community and the state. * * *

Briefly, then, I would suggest a court of suicide to which application could be made, and where all proposals would be considered on points

destruction under certain kinds of circumstances and to show that the problem facing us today is not an entirely new one and perhaps only a new twist on a very old problem. It seems reasonable to assume that a Roman or Grecian court would find Mr. Bergstedt's plea to end his life to be one justified under their laws. As I have maintained throughout, however, this is a matter for our democratically-elected representatives in the legislature. They are the ones who must answer these questions and particularly the pressing and specific question: What are we going to do about a totally paralyzed person who is undergoing the unbearable suffering that continued consciousness brings, and who wants desperately to bring his life to an end but does not have the physical capability of doing it?

## IV.

### *Conclusion*

It is not death, it is the dying that alarms me.

Montaigne

I want to be sure that the reader of this dissent does not get this case mixed up with the "right-to-die" cases in which there is present either imminent death or permanent unconsciousness. We are not dealing here with "overtreatment" or unwanted prolongation of the dying process. Kenneth Bergstedt was severely paralyzed and ventilator-dependent and suffered from what neurologists self-descriptively call the "locked-in syndrome"; but his consciousness was intact, and he had a life-expectancy of indefinite duration. It is unclear, however, whether his decision to take his own life was completely rational or possibly a product of some kind of clinically identifiable depression. The mentioned Mr. Marzen points out that Mr. Bergstedt was completely lacking in positive support, that all input was one-sided, all death and no life. According to Mr. Marzen,[12] Mr. Bergstedt was a man with

---

of equity and with regard to personal and public advantage "in camera," and without a jury. The applicant would have to satisfy the presiding judge or judges that his removal by death would be the best thing in his circumstances . . ., and that such a course would not be attended by counterbalancing disadvantages to other persons. Upon receiving satisfactory evidence on these points the court would be empowered to grant the applicant a suicide license, authorizing him to take his own life legally, and without prejudice, at the place and time named therein, and (as in the case of a marriage license) at any time within three months of the date thereon, due notice first being given to one of the court's properly authorized medical practitioners.

"A Modest Defence of Suicide," *The Green Bag,* Volume XI, The Boston Book Company (1899).

[12]*Marzen,* p. 8.

"a one sided support system of persons who espouse the erroneous view that, in the words of [psychiatrist] Dr. Jurasky, '[t]he quality of life for this man is . . . forever profaned by a future which offers no relief and only the possibility of worsening.' " With this kind of support it is no wonder that he decided to do himself in.

I have agonized over this case. At one moment I am haunted by the picture of a hopeless, wretched and tortured person who has no desire except to end his suffering by ending his life. As we know, however, he did not have it within his capacity to end his life, so that he must live on, "locked" into a condition which at the time of his death Mr. Bergstedt probably saw as one of intolerable and unrelenting misery. How can any one who can help him possibly turn down his plaint? But, then, we are not even sure of the exact nature of his mental and emotional condition, or that his depression was not a temporary one, as suggested by Mr. Marzen. In this case we will never know the truth because we heard only one side of the case, namely, Mr. Bergstedt's unopposed claim to the "right" to put an abrupt end to his life. Even if we assume, however, that Mr. Bergstedt's death wish was not generated by a one-sided support system and depression, my views of this case would remain the same.

As I have said, I know in our jurisprudence of no right to commit suicide or to be mercifully put away by the medics, "as quick[ly] and painless[ly] as possible."[13] There is no natural, constitutional, statutory or court-created right that would permit a person to have the assistance of another person in deliberately taking his own life. I am sure that no one would contend that Mr. Bergstedt had a right to suicidal assistance if he had not been incapable of doing the deed himself. So this brings us to the point, discussed above, that Mr. Bergstedt has been given the court-decreed right to assisted suicide only because he was disabled to the extent described. Such a decree should not have been entered.

I would reverse the judgment of the trial court; first, on the ground that the district court was without jurisdiction to decide an uncontested, one-sided test case and thereafter enter the subject decree; and second, on the ground that, there being no *right* vested in anyone to be put to death by another, the district court had no power to disregard the law of homicide and decree the legality of assisted suicide in this "case."

---

[13]*See* footnote 4, *supra.*