HOBBINS v ATTORNEY GENERAL

PEOPLE v KEVORKIAN NO 2

Docket Nos. 164963, 171056, 172399. Submitted January 6, 1994, at
     Lansing. Decided May 10, 1994, at 9:05 A.M. Leave to appeal
     granted, 445 Mich —.

   Teresa Hobbins, a terminally ill person, and others claiming a
   constitutional right to commit suicide, brought an action in the
   Wayne Circuit Court against the Attorney General, seeking a
   declaration that 1992 PA 270, as amended by 1993 PA 3, MCL
   752.1021 et seq.; MSA 28.547(121) et seq., which created a
   commission to study issues relating to death and dying and
   specifically criminalized assistance to suicide, is unconstitu-
   tional. The court, Cynthia D. Stephens, J., declared the crimi-
   nal provision of the act, MCL 752.1027; MSA 28.547(127),
   unconstitutional for violating Const 1963, art 4, § 24, and also
   held that individuals have a constitutional right to commit
   suicide. The Attorney General appealed (Docket No. 164963).

   Jack Kevorkian, M.D., was charged in the Wayne Circuit Court
   with assisting the suicide of Donald O'Keefe. The court, Rich-
   ard C. Kaufman, J., held that the ban on assisted suicide is
   overbroad because, in some instances, a person has a constitu-
   tional right to commit suicide. The court found that O'Keefe
   had a constitutional right to commit suicide and dismissed the
   charge. The court also held that the act, MCL 752.1021 et seq.;
   MSA 28.547(121) et seq., did not violate art 4, § 24. The prosecu-
   tion appealed (Docket No. 171056).

   Dr. Kevorkian was charged in the Oakland Circuit Court with
   assisting a suicide. The court, Jessica R. Cooper, J., declared
   the criminal provision of the act, MCL 752.1027; MSA
   28.547(127), unconstitutional for violating Const 1963, art 4,
   § 24, and dismissed the charges against Dr. Kevorkian. The
   prosecution appealed (Docket No. 172399).

     The appeals were consolidated with an additional appeal by
   the prosecution from a decision of the Oakland Circuit Court,

REFERENCES

Am Jur 2d, Constitutional Law §§ 439, 452, 571.
Supreme Court's views as to concept of "liberty" under due process
     clauses of Fifth and Fourteenth Amendments. 47 L Ed 2d 975.

David F. Breck, J., in a separate action against Dr. Kevorkian. *People v Kevorkian* (Docket No. 154740). That case was decided in a separate opinion on the same day as the present appeals.

In an opinion by FITZGERALD, P.J., joined in part by D. E. SHELTON and TAYLOR, JJ., the Court of Appeals *held:*

1. 1992 PA 270, as amended by 1993 PA 3, violates the one-object provision of Const 1963, art 4, § 24 and, therefore, is unconstitutional.

2. The Due Process Clause of the United States Constitution does not prevent a state from regulating suicide or assisted suicide.

Orders in Docket Nos. 164963 and 172399 regarding the constitutionality of 1992 PA 270, as amended by 1993 PA 3, affirmed. Order in Docket No. 171056 regarding the constitutionality of 1992 PA 270, as amended by 1993 PA 3, reversed. Orders in Docket Nos. 171056 and 172399 dismissing the charges of providing assistance to suicide, affirmed. Orders in Docket Nos. 164963 and 171056 regarding a constitutional right to commit suicide, reversed.

D. E. SHELTON, J., dissenting in part, stated that the constitution preserves and guarantees the right of a suffering terminally ill person to commit suicide and forbids the government from taking away totally that choice where the person involved has done no wrong.

TAYLOR, J., dissenting in part, stated that 1992 PA 270, as amended by 1993 PA 3, does not violate Const 1963, art 4, § 24.

1. CONSTITUTIONAL LAW — ONE-OBJECT PROVISION — STATUTES.

The purpose of the one-object provision of the constitution is to avoid bringing into one bill diverse subjects that have no necessary connection; the object of a law is the aim or general purpose of the enactment; an act may contain all matters germane to its object and any provisions that directly relate to, carry out, and implement the principal object; legislation having a primary object is not invalid where it embraces more than one means of attaining its primary object (Const 1963, art 4, § 24).

2. CONSTITUTIONAL LAW — ONE-OBJECT PROVISION — SUICIDE — ASSISTED SUICIDE.

1992 PA 270, as amended by 1993 PA 3, violates the one-object provision of Const 1963, art 4, § 24 and is unconstitutional; 1992 PA 270 as enacted has two distinct objects: the study of certain issues relating to death and dying and the establishment of the crime of criminal assistance to suicide; although encompassing the same subject, the objects are not germane to

each other, are directed toward different purposes, and, when grouped together in one act, offend the constitution's one-object provision; the fact that the act's title was amended to reflect the establishment of the crime of criminal assistance to suicide does not cure the constitutional infirmity; the one-object provision may not be circumvented by creating a title that includes more than one legislative objective (Const 1963, art 4, § 24).

3. Constitutional Law — Due Process — Suicide — Assisted Suicide.

   The commission of suicide and the assistance of the commission of suicide are not protected from state regulation by the Due Process Clause of the Fourteenth Amendment (US Const, Am XIV).

4. Constitutional Law — Due Process — Suicide — Fundamental Liberties — State Regulation.

   Rights qualifying for heightened judicial protection against state regulation include those fundamental liberties that are implicit in the concept of ordered liberty such that neither liberty nor justice would exist if they were sacrificed; they are characterized as those liberties that are deeply rooted in this nation's history and tradition; the scope of rights encompassed by the concept of ordered liberty does not include a right to commit suicide or a right to assisted suicide; a right to commit suicide is not deeply rooted in the traditions of this nation.

American Civil Liberties Union Fund of Michigan (by *Robert A. Sedler*), *Paul J. Denenfeld, Elizabeth Gleicher,* and *Eugene Feingold,* for the appellee in Docket No. 164963.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Deborah Anne Devine* and *Thomas C. Nelson,* Assistant Attorneys General, for the appellant in Docket No. 164963.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, and *Timothy A. Baughman,* Chief of Research, Training, and Appeals, for the appellant in Docket No. 171056.

*Fieger, Fieger & Schwartz, P.C.* (by *Michael A.*

*Schwartz* and *Geoffrey N. Fieger*), for the appellee in Docket No. 171056.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Richard Thompson,* Prosecuting Attorney, and *Richard H. Browne,* and *Errol H. Shifman,* Assistant Prosecuting Attorneys, for the appellant in Docket No. 172399.

*Fieger, Fieger & Schwartz, P.C.* (by *Pamela A. Hamway, Geoffrey N. Fieger,* and *Michael A. Schwartz*), for the appellee in Docket No. 172399.

Amici Curiae:

*Bodman, Longley & Dahling* (by *Martha B. Goodloe*), for the Michigan Catholic Conference in support of appellant Attorney General in Docket No. 164963.

*Curcio & Martell* (by *Elizabeth A. Curcio*), for Right to Life of Michigan, in support of appellant Attorney General in Docket No. 164963.

Wayne County Prosecutor's Office (by *John D. O'Hair,* Prosecuting Attorney, and *Timothy A. Baughman,* Chief, Research, Training, and Appeals), in support of appellant Attorney General in Docket No. 164963.

*Joseph P. Zanglin,* for certain Michigan state senators and representatives in support of appellant Attorney General, in Docket No. 164963.

*Richard Thompson,* Prosecuting Attorney, and *Errol H. Shifman,* Assistant Prosecuting Attorney, in support of appellant Wayne County Prosecuting Attorney, in Docket No. 171056.

Before: FITZGERALD, P.J., and TAYLOR and D. E. SHELTON,* JJ.

FITZGERALD, P.J., In these consolidated appeals, we are asked to determine the constitutionality of 1992 PA 270, as amended by 1993 PA 3,[1] MCL 752.1021 et seq.; MSA 28.547(121) et seq. Specifically, in Docket No. 164963, the Attorney General appeals as of right the May 24, 1993, order of Wayne Circuit Judge Cynthia D. Stephens, which declared unconstitutional the criminal provision of the act for violating Const 1963, art 4, § 24. Judge Stephens also held that individuals have a constitutional right to commit suicide. In Docket No. 171056, the prosecution appeals as of right the December 13 and 14, 1993, orders of Wayne Circuit Judge Richard C. Kaufman, who held that a ban on assisted suicide is overbroad because, in some instances, a person has a constitutional right to commit suicide. Finding that Donald O'Keefe had a constitutional right to commit suicide, Judge Kaufman dismissed the assisting suicide charge against Dr. Kevorkian stemming from his assistance in O'Keefe's suicide. Judge Kaufman also held that the act did not violate art 4, § 24. In Docket No. 172399, the prosecution appeals as of right the January 28, 1994, order of Oakland Circuit Judge Jessica Cooper, who also declared unconstitutional the criminal provision of the act for violating art 4, § 24, and therefore dismissed assisting suicide charges against Dr. Kevorkian.

Teresa Hobbins is a terminally ill person who, along with seven health care professionals and

---

* Circuit judge, sitting on the Court of Appeals by assignment.

[1] Aside from reorganizing the language in the title and making minor amendments of the language contained in § 7, 1993 PA 3 did little more than give immediate effect to 1992 PA 270.

another terminally ill person,[2] sought a declaratory judgment that 1992 PA 270, as amended by 1993 PA 3, MCL 752.1027; MSA 28.547(127), is unconstitutional. Dr. Kevorkian is a physician who has been charged with assisting a suicide in violation of MCL 752.1027; MSA 28.547(127).

Ms. Hobbins and Dr. Kevorkian first contend that 1992 PA 270, as amended by 1993 PA 3, is unconstitutional for violating Const 1963, art 4, § 24, which states: "No law shall embrace more than one object, which shall be expressed in its title." The question presented is governed by a standard of review de novo. *Mooahesh v Dep't of Treasury,* 195 Mich App 551, 562; 492 NW2d 246 (1992).

The object of a law is the aim or general purpose of the enactment. *Livonia v Dep't of Social Services,* 423 Mich 466, 497; 378 NW2d 402 (1985). While the object must be expressed in the title, the body of the law must be examined to determine whether it embraces more than one object. *Kent Co, ex rel Bd of Supervisors of Kent Co v Reed,* 243 Mich 120, 122; 219 NW 656 (1928).

The purpose of the one-object provision is to avoid bringing into one bill diverse subjects that have no necessary connection. *Mooahesh, supra* at 564. An act may contain all matters germane to its object, *Reed, supra,* and any provisions that directly relate to, carry out, and implement the principal object. *Livonia, supra* at 499. Legislation, if it has a primary object, is not invalid because it embraces more than one means of attaining its primary object. *Local No 1644, AFSC&ME, AFL-CIO v Oakwood Hosp Corp,* 367 Mich 79, 91; 116 NW2d 314 (1962).

---

[2] The health care professionals were dismissed by the trial court for lack of standing, and the remaining plaintiff is not a party to this appeal.

The one-object provision is to be construed reasonably and not in so narrow or technical a manner as to frustrate the legislative intent. *Kuhn v Dep't of Treasury,* 384 Mich 378, 387-388; 183 NW2d 796 (1971). However, the Supreme Court has not hesitated to hold void legislation enacted to evade the procedural requirements that the constitution places on legislation. *United States Gypsum Co v Dep't of Revenue,* 363 Mich 548, 554; 110 NW2d 698 (1961).

1992 PA 270 is entitled:

An act to create the Michigan commission on death and dying; to prescribe its membership, powers, and duties; to provide for the development of legislative recommendations concerning certain issues related to death and dying; to prohibit certain acts pertaining to the assistance of suicide; to prescribe penalties; and to repeal certain parts of this act on a specific date.

Section 1 of the act provides:

The legislature finds that the voluntary self-termination of human life, with or without assistance, raises serious ethical and public health questions in the state. To study this problem and to develop recommendations for legislation, the Michigan commission on death and dying is created. [MCL 752.1021; MSA 28.547(121).]

Sections 2 through 6 of the act establish the membership of the commission and define its role and duties.

Section 7 of the act creates a new crime of "criminal assistance to suicide," which makes it a felony where a person does either of the following:

(a) Provides the physical means by which the other person attempts or commits suicide.

(b) Participates in a physical act by which the other person attempts or commits suicide. [MCL 752.1027(1)(a), (b); MSA 28.547(127)(1)(a), (b).]

1992 PA 270 had its origin in House Bill 4501. Examination of both the title and content of HB 4501 at various states of the legislative process is necessary to aid in the inquiry whether 1992 PA 270 contains more than one object.

As first introduced on March 7, 1991, the sole purpose of HB 4501 was to create a new public act to establish a commission to study certain issues related to death and dying. House Bill 4501 was entitled:

A bill to create the Michigan commission on death and dying; to prescribe its membership, powers, and duties; and to provide for the development of legislative recommendations concerning certain issues related to death and dying.

At the time HB 4501 was introduced, Senate Bill 32 and House Bill 4038 were pending before the House Judiciary Committee. The bills were devoted to amending the Penal Code to "prohibit a person from causing, providing the means of, or acting as a participant in a suicide or attempted suicide."

On November 12, 1992, the House Judiciary Committee approved HB 4501. The title and provisions of HB 4501 were amended after the second reading on November 24, 1992, the day after Dr. Kevorkian provided assistance to another suicide, to include criminal proscriptions similar to those contained in SB 32. The amended version of HB 4501 became 1992 PA 270.

The original purpose of HB 4501, as expressed in both the title and body of the bill, was to create a new public act to study certain issues related to

death and dying. This bill had no regulatory authority. When HB 4501 was amended to add the substance of SB 32, the additional provisions had another and different objective—to amend the Penal Code to create the crime of criminal assistance to suicide.

The Attorney General posits both objectives are within the act's primary purpose of regulating assisted suicide. However, neither the original title of HB 4501 nor the title of 1992 PA 270 as enacted declare such a purpose.[3] A fair reading of 1992 PA 270 reveals that, although encompassing a single "subject,"[4] the legislation has two primary objectives. These objectives were originally the subjects of two distinct bills. One bill (HB 4501) encompassed the study of issues related to voluntary self-termination of life, *with or without assistance,* and another (SB 32) encompassed only the crime of criminal assistance to suicide. The suggestion that the amendment of HB 4501 to include the substantive provisions of SB 32 resulted in one primary purpose of "regulating assisted suicide" is unpersuasive in the absence of a comprehensive declaration of such a purpose in the title of the act. *People v Milton,* 393 Mich 234, 246-247; 224 NW2d 266 (1974).

Had the Legislature intended to codify or regulate the general "subject" of assisted suicide,[5] it

---

[3] If the primary purpose of HB 4501 was to regulate assisted suicide, it would have been unnecessary for the Legislature to amend the title of HB 4501 because a title need not be an index of an act's provisions. *Builders Square v Dep't of Agriculture,* 176 Mich App 494, 498; 440 NW2d 639 (1989).

[4] The one-object provision may not be circumvented by enacting a law that involves a single subject but is designed to accomplish different objectives. *Advisory Opinion on Constitutionality of 1975 PA 227,* 396 Mich 123, 129-130; 240 NW2d 193 (1976).

[5] See, e.g., *Builders Square, supra,* n 3 (a case on which the Oakland County prosecutor relies), and numerous other codified areas of the law, e.g., the Drain Code, MCL 280.1 *et seq.;* MSA 11.1001 *et seq.,* and the Insurance Code, MCL 500.100 *et seq.;* MSA 24.1100 *et seq.*

could have notified the public of this intention by declaring a single broad purpose and by joining the object contained in HB 4501 with the object contained in SB 32 together in one bill. This the Legislature did not do. This failure resulted in the body of the act containing two distinct objects. The fact that the title was amended to reflect the addition of § 7 does not cure the constitutional infirmity. The one-object provision may not be circumvented by creating a title that includes different legislative objects. *Hildebrand v Revco Discount Drug Centers,* 137 Mich App 1, 11; 357 NW2d 778 (1984). We find, therefore, that 1992 PA 270 as enacted has two distinct objects that, although encompassing the same "subject," are not germane to each other, are directed toward different purposes and, when grouped together in one act, offend the constitutional one-object provision.[6] In reaching this conclusion, we recall the Supreme Court's pronouncement in *Advisory Opinion on Constitutionality of 1975 PA 227,* 396 Mich 123, 133; 240 NW2d 193 (1976):

> This Court is mindful of the worthy purpose and high motivation of the Legislature and the proponents of the subject Act. It also is mindful of the basic dictates of the Constitution of this state. Our test cannot be one of policy but one of constitutionality. On that test, the Act must fall.

The Oakland County Prosecutor relies on *People v Trupiano,* 97 Mich App 416; 296 NW2d 49 (1980). In *Trupiano,* provisions of the Public Health Code creating departments charged with enforcing the

---

[6] To buttress our conclusion, though certainly not controlling, we have in this case the opinion from the counsel for the House Judiciary Committee that the amendment of HB 4501 would violate the one-object provision of art 4, § 24. Similarly, in analyzing HB 4501 as enrolled, the House Legislative Service Bureau opined that the bill is subject to a constitutional challenge based on art 4, § 24.

code and including a provision to prescribe criminal penalties for possession of controlled substances, survived a constitutional challenge based on a violation of the one-object provision.

*Trupiano* is distinguishable from the instant case. *Trupiano* involved a legislative enactment that constituted a "code." As noted by the Court in *Trupiano, supra* at 420:

> The Supreme Court has recognized a wide degree of discretion in reviewing legislative enactments which constitute a "code." In *Advisory Opinion re Constitutionality of 1972 PA 294* [389 Mich 441; 208 NW2d 469 (1973)], the Court noted at 463:
> "Emphasis is given to the fact that the subject matter constitutes a code and that inherently the scope of a code must be broad enough to encompass the various facets necessary to the drafting of a unified law. If we fail to permit such a design codes may not be enacted in Michigan so long as the 'one-object' limitation is present in the constitution."

Thus, codes that have a general purpose or aim that is implemented through a number of specific statutory provisions have survived challenges based on a violation of the one-object provision because if too strict a reading is given art 4, § 24, no codes enacted in Michigan would be constitutional. See *Advisory Opinion re Constitutionality of 1972 PA 294, supra* at 463. The act in this case is not a codification, and, as previously noted, the attempt to define the object broadly to encompass all subjects related to the issue of assisted suicide is unpersuasive.

1992 PA 270, as amended by 1993 PA 3, violates the one-object provision of Const 1963, art 4, § 24 and, therefore, is unconstitutional. In light of this

conclusion, we need not address the remainder of the constitutional challenges to the act. However, in anticipation of Supreme Court review, and in the interest of judicial economy, we will briefly address Ms. Hobbins' argument that Michigan's assisted suicide statute deprives its citizens of a constitutional right protected by the Due Process Clause of the Fourteenth Amendment.

In *Roe v Wade,* 410 US 113, 153; 93 S Ct 705; 35 L Ed 2d 147 (1973), the United States Supreme Court posited the existence of a "right of privacy, . . . founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action, . . . broad enough to encompass a woman's decision whether or not to terminate her pregnancy." The Court, however, expressly stated that this "privacy right . . . cannot be said to be absolute," and noted that it has consistently "refused to recognize an unlimited right of this kind in the past." *Id.* at 154. Essential to the analysis in the case at bar is the Supreme Court's recognition and affirmation of the state's compelling interest in protecting life: "[T]he State's important and legitimate interest in . . . protecti[ng] . . . fetal life after viability [justifies legislation that] may go so far as to proscribe abortion during that period, except when it is necessary to preserve the life or health of the mother." *Id.* at 163-164. Furthermore, "a State [has] an unqualified interest in the preservation of human life." *Cruzan v Director, Missouri Dep't of Health,* 497 US 261, 282; 110 S Ct 2841; 111 L Ed 2d 224 (1990). The constitutionality of legislative enactments to protect life is clearly established in our law.[7]

---

[7] The legitimate state interest in protecting life recently was reaffirmed in *Planned Parenthood of Southeastern Pennsylvania v Casey,* 505 US —, —, —, —, —; 112 S Ct 2791; 120 L Ed 2d 674, 710, 738, 773, 783 (1992).

When individuals assert constitutional rights against state regulation, whether encompassed by the "zones of privacy" recognized in *Roe* or acknowledged as a liberty interest protected by the Due Process Clause of the Fourteenth Amendment, a court must balance the individual interest against the state's interest. *Cruzan, supra* at 279; *Roe, supra* at 154. It is, of course, necessary that the asserted right be one that is accorded constitutional protection under our law. That is not the case in the instant matter.

Determination of the existence of "rights not readily identifiable in the Constitution's text" sometimes, as in the opinions under review here, seems merely "the imposition of the [judges'] own choice of values." Attempting "to identify the nature of the rights qualifying for heightened judicial protection," the Supreme Court has ruled "that this category includes those fundamental liberties that are 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if [they] were sacrificed.' [Alternatively,] they are characterized as those liberties that are 'deeply rooted in this Nation's history and tradition.' " *Bowers v Hardwick,* 478 US 186, 191-192; 106 S Ct 2841; 92 L Ed 2d 140 (1986) (citations omitted). The "right" asserted by Ms. Hobbins—the right to commit suicide—satisfies neither definition.

The scope of rights encompassed by the concept of ordered liberty does not include the right to commit suicide, much less the right to assisted suicide. The "guarantee of personal privacy" has been "exten[ded] to activities relating to marriage, procreation, contraception, family relationships, and child rearing and education." *Roe, supra* at 152-153 (citations omitted). Judicial discovery of a right to terminate one's life is not a logical exten-

sion of this catalog of rights.[8] Liberty and justice
will not cease to exist if a right to commit suicide
is not recognized.

Ms. Hobbins argues that the liberty interest[9]
recognized in *Cruzan* supports the broader concept
of a right to self-determination, which necessarily
encompasses the right asserted here. However, Ms.
Hobbins misapprehends the true nature of the
right recognized in *Cruzan*.

The Supreme Court began its discussion of the
issue before it in *Cruzan* by noting the common-
law basis of "the right of a competent individual to
refuse medical treatment [and stating] that a com-
petent person has a constitutionally protected lib-
erty interest in refusing unwanted medical treat-
ment." The Court noted: "This is the first case in
which we have been squarely presented with the
issue whether the United States Constitution
grants what is in common parlance referred to as
a 'right to die.'" The Court then made clear its
intention to "follow the judicious counsel . . . 'not
to attempt, by any general statement, to cover
every possible phase of the subject.'" *Cruzan,
supra* at 277-278 (citation omitted). The right rec-
ognized in *Cruzan* was only to refuse unwanted
medical treatment and passively die a natural
death, not to actively intervene so as to hasten

[8] Even in these areas, the Supreme Court has not found that all
rights are implicit in the concept of ordered liberty. For example, the
Court has expressly rejected the contention that a right to consensual
sodomy is implicit in the concept of ordered liberty, or that an unwed
father's liberty interest was violated by a statute's presumption that
the husband of the child's mother is the child's father and that denied
him any right to visitation. *Bowers, supra; Michael H v Gerald D,* 491
US 110; 109 S Ct 2333; 105 L Ed 2d 91 (1989).

[9] The *Cruzan* Court noted that "many state courts have held that a
right to refuse treatment is encompassed by a generalized constitu-
tional right of privacy," [see, e.g., *In re Quinlan,* 70 NJ 10; 355 A2d
647 (1976)] but expressed its belief that "this issue is more properly
analyzed in terms of a Fourteenth Amendment liberty interest."
*Cruzan,* 497 US 279, n 7.

one's death. Furthermore, even this limited right is not absolute: "It cannot be disputed that the Due Process Clause protects an interest in life as well as an interest in refusing life-sustaining medical treatment." *Id.* at 281. The right asserted by Ms. Hobbins is not a fundamental liberty; liberty and justice will not cease to exist as a result of this Court's decision not to accord it constitutional status.

Neither is the right to commit suicide deeply rooted in this nation's traditions. At common law, a suicide incurred criminal liability and harsh penalties. "Although the States abolished the penalties . . . , they did so to spare the innocent family and not to legitimize the act." *Id.* at 294 (Scalia, J., concurring). Furthermore, "[c]ase law at the time of the adoption of the Fourteenth Amendment generally held that assisting suicide was a criminal offense. . . . And most states that did not explicitly prohibit assisted suicide in 1868 recognized, when the issue arose in the 50 years following the Fourteenth Amendment's ratification, that assisted and (in some cases) attempted suicide were unlawful." *Id.* at 294-295 (citation omitted). There is, therefore, no significant support for the proposition that a right to commit suicide is rooted at all in our nation's history.

There is a "rationalizing principle" that justifies the inclusion of nontextual rights on the list of protected rights, that designates them as "implicit in the concept of ordered liberty." Faced with an individual-rights challenge to a legislative enactment, the courts must answer this question: "Does [the statute] violate those 'fundamental principles of liberty and justice which lie at the base of all our civil and political institutions?'" *Palko v Connecticut,* 302 US 319, 325, 328; 58 S Ct 149; 82 L Ed 288 (1937) (citation omitted). With regard to an

alleged right to commit suicide, the answer is clearly no. We therefore decline to find such a right.

The wisdom of judicial circumspection in discovering new constitutional rights has been cogently expressed by Justice Byron White:

> That the Court has ample precedent for the creation of new constitutional rights should not lead it to repeat the process at will. The Judiciary, including this Court, is the most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or even the design of the Constitution. Realizing that the present construction of the Due Process Clause represents a major judicial gloss on its terms, as well as on the anticipation of the Framers, . . . the Court should be extremely reluctant to breathe still further substantive content into the Due Process Clause so as to strike down legislation adopted by a State or city to promote its welfare. Whenever the Judiciary does so, it unavoidably pre-empts for itself another part of the governance of the country without express constitutional authority. [*Moore v East Cleveland Ohio,* 431 US 494, 544; 97 S Ct 1932; 52 L Ed 2d 531 (1977) (White, J., dissenting).]

The orders in Docket Nos. 164963 and 172399 regarding the constitutionality of the statute are affirmed. The orders in Docket Nos. 171056 and 172399 dismissing the charges of providing assistance to suicide are affirmed.[10] Judge Stephens' order in Docket No. 164963 and Judge Kaufman's order in Docket No. 171056 are reversed with respect to their holdings regarding a constitutional right to commit suicide. Judge Kaufman's order in

[10] Judge Kaufman reached the correct result in dismissing the case, albeit for the wrong reason.

Docket No. 171056 regarding the constitutionality of the statute is also reversed.

D. E. Shelton, J. *(concurring in part and dissenting in part).* I concur in the opinion of Judge Fitzgerald that 1992 PA 270, as amended by 1993 PA 3, violates the one-object provision of our state constitution. I therefore concur in Judge Fitzgerald's resolution of that issue in each of these three cases. I dissent from that portion of the opinion that dismisses the claims under the Due Process Clause of the United States Constitution and write separately to address that issue.

It is the seminal claim of Ms. Hobbins, Dr. Kevorkian, and the original physician and terminally ill plaintiffs in *Hobbins,* that a suffering, terminally ill person has a constitutional right to control his or her own body to end his or her suffering by death and with the assistance of a physician. The constitutional claim is derived from the Due Process Clause of the Fourteenth Amendment of the United States Constitution, which provides that no state shall "deprive any person of life, liberty, or property, without due process of law." For over one hundred years, the United States Supreme Court has held that this clause includes substantive as well as procedural rights. See *Mugler v Kansas,* 123 US 623; 8 S Ct 273; 31 L Ed 205 (1887); *Poe v Ullman,* 367 US 497; 81 S Ct 1752; 6 L Ed 2d 989 (1961); *Daniels v Williams,* 474 US 327; 106 S Ct 662; 88 L Ed 2d 662 (1986); *Planned Parenthood of Southeastern Pennsylvania v Casey,* 505 US —; 112 S Ct 2791; 120 L Ed 2d 674 (1992). In this manner, the constitution protects the fundamental rights of citizens that comprise their "liberty" against invasion by the state.

The scope of these substantive liberties is not limited to those provided by the Bill of Rights or

to those rights recognized at the time the clause was enacted. Nor, as urged by appellants, can they be defined by some formula based upon prior "tradition and practices," although tradition is a factor. The Supreme Court recently addressed this concept in *Casey,* 505 US —, 112 S Ct 2806, quoting *Poe, supra* at 542:

> The inescapable fact is that adjudication of substantive due process claims may call upon the Court in interpreting the Constitution to exercise that same capacity which by tradition courts always have exercised: reasoned judgment. Its boundaries are not susceptible of expression as a simple rule. That does not mean we are free to invalidate state policy choices with which we disagree; yet neither does it permit us to shrink from the duties of our office. As Justice Harlan observed:
>
> "Due process has not been reduced to any formula; its content cannot be determined by reference to any code. The best that can be said is that through the course of this Court's decisions it has represented the balance which our Nation, built upon postulates of respect for the liberty of the individual, has struck between that liberty and the demands of organized society. If the supplying of content to this Constitutional concept has of necessity been a rational process, it certainly has not been one where judges have felt free to roam where unguided speculation might take them. The balance of which I speak is the balance struck by this country, having regard to what history teaches are the traditions from which it developed as well as the traditions from which it broke. That tradition is a living thing. A decision of this Court which radically departs from it could not long survive, while a decision which builds on what has survived is likely to be sound. No formula could serve as a substitute, in this area, for judgment and restraint."

If the determination of which liberties are included within the meaning of "due process" were delimited by tradition alone, no expansion of liberties in the name of the constitution would ever have been made in the last two centuries.[1]

Our judicial history has of course been to the contrary and we must look initially for guidance to the panoply of rights that the Supreme Court has previously defined as individual "liberties" to determine if a personal right to end suffering by hastening one's own death is rationally within the scope of that constitutional protection. I conclude that it is.

Most of the Supreme Court decisions that de-

---

[1] The conclusion that "the right to commit suicide," *ante* at 208, is not deeply rooted in this nation's traditions certainly is not therefore dispositive. More importantly, the statement that "[t]here is . . . no significant support for the proposition that a right to commit suicide is rooted at all in our nation's history," *ante* at 208, is factually incorrect. Suicides by terminally ill persons have occurred throughout our history and indeed have often taken place with the quiet and unpublicized assistance of treating physicians and family members. The following was noted in Quill, Cassel & Meier, *Care of the hopelessly ill, Proposed clinical criteria for physician-assisted suicide,* The New England Journal of Medicine (November 5, 1992) 1380, 1381:

> It is not known how widespread physician-assisted suicide currently is in the United States, or how frequently patients' requests are turned down by physicians. Approximately 6000 deaths per day in the United States are said to be in some way planned or indirectly assisted, probably through the "double effect" of pain-relieving medications that may at the same time hasten death or the discontinuation of or failure to start potentially life-prolonging treatments. From 3 to 37 percent of physicians responding to anonymous surveys reported secretly taking active steps to hasten a patient's death, but these survey data were flawed by low response rates and poor design. Every public-opinion survey taken over the past 40 years has shown support by a majority of Americans for the idea of physician-assisted death for the terminally ill.

Additionally, the issue here is not whether a healthy person should be granted an unrestricted "right to commit suicide" but rather the ability of a suffering terminally ill patient to decide to end that suffering with death and to have a doctor assist in implementing that decision.

scribe the compass of an individual's right to "liberty" or freedom from government intrusion have involved personal and family decisions. These cases must be viewed as a developing "rational continuum," as described by Justice Harlan in *Poe, supra* at 543. Taken together, they demonstrate that the Supreme Court has found that the Due Process Clause of the United States Constitution limits the power of the government to intrude into personal decisions involving the basic integrity of an individual's body or family. Justice O'Connor spoke for the Court in *Casey,* 505 US —; 112 S Ct 2807, and described the essence of the cases defining "liberty":

> Our law affords constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education. *Carey v Population Services International,* 431 US [678, 685; 97 S Ct 2010; 52 L Ed 2d 675 (1977)]. Our cases recognize "the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt v Baird* [405 US 438, 453; 92 S Ct 1029; 31 L Ed 2d 349 (1972)]. Our precedents "have respected the private realm of family life which the state cannot enter." *Prince v Massachusetts,* 321 US 158, 166; 64 S Ct 438; 88 L Ed 645 (1944). These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. *At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life.* Beliefs about these matters could not define the attributes of personhood where they formed under compulsion of the State. [Emphasis added.]

In *Casey,* the Court reaffirmed its decision in *Roe v*

*Wade,* 410 US 113; 93 S Ct 705; 35 L Ed 2d 147 (1973), that a woman has the liberty to decide whether to have an abortion before the viability of the fetus. The Court in *Roe* described this realm of protected personal liberties as the "right of privacy." In *Cruzan v Director, Missouri Dep't of Health,* 497 US 261; 110 S Ct 2841; 111 L Ed 2d 224 (1990), the Supreme Court addressed the issue that had been posed earlier in *In re Quinlan,* 70 NJ 10; 355 A2d 647 (1976). In *Quinlan,* the court found that a severely brain-damaged woman had a right of privacy, protected by the federal constitution, that included her right to terminate the use of equipment that was prolonging her existence. In *Cruzan, supra* at 278, the Supreme Court affirmed the principal of *Quinlan* that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment" even if that refusal will result in that person's death. The Court found that even "the refusal of artificially delivered food and water is encompassed within that liberty interest." *Cruzan, supra* at 287 (Justice O'Connor, concurring). As Chief Justice Rehnquist put it, "[t]he choice between life and death is a deeply personal decision of obvious and overwhelming finality." *Cruzan, supra* at 281.[2]

---

[2] The *Cruzan* decision followed a number of state court decisions in addition to *Quinlan.* Some of those opinions offer insights that are helpful. In *Bouvia v Superior Court,* 179 Cal App 3d 1127, 1147; 225 Cal Rptr 297 (1986), Justice Compton stated in his concurring opinion:

Elizabeth apparently has made a conscious and informed choice that she prefers death to continued existence in her helpless and, to her, intolerable condition. I believe she has an absolute right to effectuate that decision. This state and the medical profession instead of frustrating her desire, should be attempting to relieve her suffering by permitting and in fact assisting her to die with ease and dignity. The fact that she is forced to suffer the ordeal of self-starvation to achieve her objective is in itself inhumane.

The right to die is an integral part of our right to control our

Against this background, we are squarely presented with the question whether the situation of an assisted suicide to a suffering terminally ill person is significantly different from the rights defined by the Supreme Court in those cases. To pose the question makes the answer obvious. If a terminally ill person can lawfully end her life by disconnecting a life-sustaining machine (*Cruzan*), why cannot she end that same life by connecting a life-ending machine? If a healthy woman can lawfully terminate a healthy fetus (*Roe, Casey*), does not that same woman who is later terminally and painfully ill have a right to terminate her own life? Does the state have a right to totally prevent a terminally ill person from ending her life by charging the doctor who assists her with a felony punishable by four years' imprisonment, or even with murder?[3] If a doctor (or even a nurse or medical assistant) can lawfully end a patient's life

_____

own destinies so long as the rights of others are not affected. That right should, in my opinion, include the ability to enlist assistance from others, including the medical profession, in making death as painless and quick as possible.

And in *McKay v Bergstedt,* 106 Nev 808, 818, 822; 801 P2d 617 (1990), the Nevada Supreme Court stated:

> [A]t some point in the life of a competent adult patient, the present or prospective quality of life may be so dismal that the right of the individual to refuse treatment or elect a discontinuance of artificial life support must prevail over the interest of the State in preserving life. In instances where the prospects for a life of quality are smothered by physical pain and suffering, only the sufferer can determine the value of continuing mortality. . . .

*       *       *

> . . . The State's interest in the preservation of life relates to meaningful life.

[3] In a separate opinion in *People v Kevorkian,* Docket No. 154740, Judges FITZGERALD and TAYLOR have held that Dr. Kevorkian may be charged with the crime of murder for assisting in a suicide before the enactment of the statute that is at issue in these cases. Although the majority has chosen to separate the opinions, these cases were consolidated because they all pose the same constitutional issue. I have

by disconnecting a life-sustaining machine (*Cruzan*), why cannot a doctor do the same by connecting a life-ending machine? If a healthy woman has a right to have a doctor assist (and indeed can only use a doctor to assist) to lawfully terminate a healthy fetus (*Roe, Casey*), does not that same woman who is later terminally and painfully ill have a right to have a doctor assist to terminate her own life? If ending one's own life is a lawful act, how can the state punish a doctor who assists in that lawful conduct?

A federal district court in the State of Washington very recently analyzed a similar assisted-suicide statute in that state and similarly concluded that *Casey* and *Cruzan* require the courts to find a constitutionally protected liberty interest in the decision of a terminally ill person to hasten death. In *Compassion in Dying v Washington,* — F Supp —, —, — (WD Wash, May 3, 1994) (Docket No. C94-119R), Judge Rothstein held:

> Like the abortion decision, the decision of a terminally ill person to end his or her life "involv[es] the most intimate and personal choices a person may make in a lifetime" and constitutes a "choice[] central to personal dignity and autonomy."

and:

> There is no more profoundly personal decision, nor one which is closer to the heart of personal liberty, than the choice which a terminally ill person makes to end his or her suffering and hasten an inevitable death. From a constitutional

dissented from the opinion in Docket No. 154740 primarily on the basis of the reasons set forth in my opinion in these cases. It seems self-evident that if the state may not constitutionally criminalize conduct with a felony punishable by four years' imprisonment, it clearly may not do so with a murder charge.

perspective, the court does not believe that a distinction can be drawn between refusing life-sustaining medical treatment and physician-assisted suicide by an uncoerced, mentally competent, terminally ill adult.

The majority opinion on this issue attempts to draw such a distinction from *Cruzan* on the basis that "[t]he right recognized in *Cruzan* was only to refuse unwanted medical treatment and passively die a natural death, not to actively intervene so as to hasten one's death." *Ante* at 207-208. This is apparent acceptance of the state's suggestion that it is the active, rather than passive, nature of the assistance here that extinguishes the right of the suffering patient. Aside from the serious question whether starving Ms. Cruzan to death was "natural," the best reply to this suggestion is perhaps found in Justice Scalia's concurrence in *Cruzan, supra* at 296-297, quoting 4 Blackstone, Commentaries, p 189:

> Suicide, it is said, consists of an affirmative act to end one's life; refusing treatment is not an affirmative act "causing" death, but merely a passive acceptance of the natural process of dying. . . . It would not make much sense to say that one may not kill oneself by walking into the sea, but may sit on the beach until submerged by the incoming tide; or that one may not intentionally lock oneself into a cold storage locker, but may refrain from coming indoors when the temperature drops below freezing. . . .
>
> . . . Starving oneself to death is no different from putting a gun to one's temple as far as the common-law definition of suicide is concerned; the cause of death in both cases is the suicide's conscious decision to "pu[t] an end to his own existence."

If the active-passive distinction has any meaning,

it would not be in the situations presented here.
The third person who turns off the life-supporting
machine must perforce affirmatively do so. Here,
the assistant places the means within the control
of the patient and allows the patient to take the
final active step.

On a far less legalistic basis, the honest inten-
tion of the assisting person in both instances is the
same. When the medical person turned off the life
supporting machinery to Karen Quinlan, that per-
son intended and expected the patient to die just
as surely as did Dr. Kevorkian when he showed
his suffering patients how to activate his lethal
devices and placed the devices within their control.
If anything, the intent is less onerous in these
instances because, at least as compared to Ms.
Quinlan and other incompetent patients, these
patients made the final personal decision and took
the final personal action for themselves.

It is also suggested by the state that it is the
involvement of another person in assisting the
death that makes the situation different. Such a
contention ignores the clear import of *Roe, Casey,
Quinlan, Cruzan,* and all the other due process
cases involving medical procedures. A woman's
right to have an abortion involves, by necessity
and for safety, the assistance of another person.
Similarly, it is obvious that neither Ms. Quinlan
nor Ms. Cruzan was going to be able to terminate
their life-support equipment without the assistance
of another person. Indeed, the availability of that
assistance was what those cases were, and what
these cases are, ultimately about. Again, if any-
thing, the situations here involve less immediate
assistance because the patients personally acti-
vated the equipment that caused their death.

In the end, as far as the liberty interest of the
patient is concerned, the truth is that there is

simply no rational distinction between assisting the termination of life support to a suffering terminally ill patient and assisting the administration of life-ending measures to a suffering terminally ill patient.

Aside from a review of the cases in which the Supreme Court has previously defined the rights and liberties protected by constitutional due process, we must decide if the right to end personal pain and suffering is "implicit in the concept of ordered liberty." Liberty in the context of our constitution means the freedom of an individual to determine matters about himself for himself and not have others, even if they are in the majority and thus comprise the government, force their will upon the individual. The basic concept of self-determination and personal autonomy is the central point of our constitutional structure. In matters that relate solely to ourselves, we alone are free to decide our personal fate and neither the mob nor the government may take that away from us. As the Supreme Court said over one hundred years ago in *Union Pacific R Co v Botsford,* 141 US 250, 251; 11 S Ct 1000; 35 L Ed 734 (1891):

> No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law. As well said by Judge Cooley, "The right to one's person may be said to be a right of complete immunity: to be let alone." Cooley on Torts, 29.

In the context of these cases, the essence of self-determination is the decision whether to continue to endure insufferable pain. The power to determine the limits to which one can endure pain and

agony is certainly intrinsic to this basic concept of personal autonomy. It is difficult to imagine a more personal choice than whether to continue life when faced with a terminal and excruciatingly painful condition. The poignant truth of Justice O'Connor's observation in *Casey, supra,* makes it worthy of repetition:

> At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. [*Casey,* 505 US —; 112 S Ct 2807.]

The real issue in these cases is not whether there is some broad "right to commit suicide" but, rather, whether an individual, and not the government, has the right of choice between enduring pain and suffering or ending that suffering with death. Stated conversely, the issue is whether our government has the right to force us, against our will, to live out a life of pain and suffering when we have done no wrong to anyone else. I conclude, without hesitation, that our constitution preserves and guarantees our right to make that decision for ourselves and that it forbids the government from taking that choice from us when we have done no wrong. There could be no more basic right in our ordered concept of liberty.

This conclusion, however, does not mean that the state may not regulate and control that choice. As the Court said in *Cruzan, supra* at 279, quoting *Youngberg v Romeo,* 457 US 307, 321; 102 S Ct 2452; 73 L Ed 2d 28 (1982):

> But determining that a person has a "liberty interest" under the Due Process Clause does not end the inquiry; "whether respondent's constitutional rights have been violated must be deter-

mined by balancing his liberty interests against the relevant state interests."

Certainly where the state has a legitimate interest in such matters as the preservation of life and family, the Court has indicated that it may fetter individual choice in those areas with a variety of controls and impediments designed to ensure that the choice is voluntarily and knowingly made and that it is implemented under safe and reasonable conditions. Indeed, in *Cruzan,* the Court upheld Missouri's insistence upon a requirement of clear and convincing evidence to establish the patient's true intent. And, in *Webster v Reproductive Health Services,* 492 US 490; 109 S Ct 3040; 106 L Ed 2d 410 (1989), as well as *Casey, supra,* the Court clearly indicated that it would allow the states considerable latitude in controlling and regulating the choice of a woman to have an abortion.

The State of Michigan clearly has public interests in the decision of a suffering terminally ill patient to end that suffering with death. In addition to its generally recognized interest in the preservation of life, the state may legitimately be concerned, for example, that the patient be given ample opportunity for medical consultation about the nature and permanence of the underlying condition, that the patient has received available medical and psychiatric assistance, or that the procedure is performed under proper medical conditions by an appropriate medical assistant. Indeed, this is an area of medical concern where the state clearly should be involved to ensure the public welfare.

But the extent to which the state may fetter or control the patient's liberty to choose death is not before us. If the Michigan assisted suicide statute "has the purpose or effect of placing a substantial

obstacle in the path" of the exercise of a constitutionally protected liberty interest, the statute violates due process. *Casey,* 505 US —; 112 S Ct 2820. In this statute, the state has chosen to do virtually the only thing that the constitution does not allow: the absolute prohibition of the making of that personal choice by criminalizing it. The appellants assert that this is a permissible means of "regulating" a personal liberty interest because of the overwhelming interest of the state. The argument stems from what some have characterized as the "slippery slope" fear that anything less than a total prohibition of assisted suicide will eventually result in the uncontrolled and irresponsible taking of a multitude of lives in situations far less compelling than the individuals involved in these cases. The argument is unsound. If a state can "regulate" such a personal choice by completely prohibiting it, there would be no meaningful choice in the first instance. As stated in *Compassion in Dying v Washington, supra:*

> But despite the general validity of the State's concern, the slippery slope argument cannot prevail in this instance. It may be difficult to define the kinds of assistance which are necessary and should be permitted in order to honor terminally ill patients' protected liberty interest in hastening their death. However, that is not a sufficient excuse for precluding *entirely* the exercise of a constitutional right. The court has no doubt that the legislature can devise regulations which will define the appropriate boundaries of physician-assisted suicide for terminally ill individuals, and at the same time give due recognition to the important public policy concerns regarding the prevention of suicide.

We need not speculate here about the extent to which the state may regulate the liberty involved

here. We need only say, and should say, that the state may not completely outlaw it as this statute purports to do. This government may not totally take from us our inherent right to determine not only who we are but, even more essentially, whether we are.

Taylor, J. *(concurring in part and dissenting in part)*. I join Judge Fitzgerald's substantive due process analysis without any reservations. However, I respectfully dissent from the majority's interpretation of the title-object clause, Const 1963, art 4, § 24. The assistance to suicide act (the Act), 1992 PA 270, as amended by 1993 PA 3, MCL 752.1021 *et seq.*; MSA 28.547(121) *et seq.*, does not violate this constitutional provision.

At the outset, I would call attention to the well-established maxims of judicial review applicable in cases where constitutional challenges are brought against legislative enactments:

> A statute will be presumed to be constitutional by the courts unless the contrary clearly appears; and in case of doubt every possible presumption not clearly inconsistent with the language and the subject matter is to be made in favor of the constitutionality of legislation. . . . Every reasonable presumption or intendment must be indulged in favor of the validity of an act, and it is only when invalidity appears so clearly as to leave no room for reasonable doubt that it violates some provision of the Constitution that a court will refuse to sustain its validity. A statute is presumed to be constitutional and it will not be declared unconstitutional unless clearly so, or so beyond a reasonable doubt. [*Rohan v Detroit Racing Ass'n,* 314 Mich 326, 341-342; 22 NW2d 433 (1946).]

Construing identical language over a century

ago, our Supreme Court explained the purpose of
the title-object clause as follows:

> The history and purpose of this constitutional
> provision are too well understood to require any
> elucidation at our hands. The practice of bringing
> together into one bill subjects diverse in their
> nature, and having no necessary connection, with
> a view to combine in their favor the advocates of
> all, and thus secure the passage of several mea-
> sures, no one of which could succeed upon its own
> merits, was one both corruptive of the legislator
> and dangerous to the state. It was scarcely more
> so, however, than another practice, also intended
> to be remedied by this provision, by which,
> through dexterous management, clauses were in-
> serted in bills of which the titles gave no intima-
> tion, and their passage secured through legislative
> bodies whose members were not generally aware
> of their intention and effect. There was no design
> by this clause to embarrass legislation by making
> laws unnecessarily restrictive in their scope and
> operation, and thus multiplying their number; but
> the framers of the constitution meant to put an
> end to legislation of the vicious character referred
> to, which was little less than a fraud upon the
> public, and to require that in every case the pro-
> posed measure should stand upon its own merits,
> and that the legislature should be fairly notified of
> its design when required to pass upon it. [*People v
> Mahaney,* 13 Mich 481, 494-495 (1865).]

In finding the Act violative of art 4, § 24, the
lower court opinions, as well as the majority here,
emphasize that this clause is intended to prevent
the combination in one bill of legislative goals or
objects "having no necessary connection." The
majority concludes that the Act contains two ob-
jects—study of possible legislative action concern-
ing assisted suicide and the criminalization of
assisted suicide—and that these objects have no

necessary connection. This confuses the object of the Act with the means utilized to accomplish that object. It also gives a crabbed reading to the phrase "no necessary connection," depriving it of its intended meaning by taking it out of its context in the *Mahaney* case.

The majority argues that the statute has one subject, but two objects. That is, at best, to put too fine a point on things. Our Supreme Court has explained that "[t]he 'object' of a law is its general purpose or aim." *Livonia v Dep't of Social Services,* 423 Mich 466, 497; 378 NW2d 402 (1985). Furthermore,

> [t]o require that every end and means necessary to the accomplishment of this general object should be provided for by a separate act relating to that alone, would not only be senseless, but would actually render legislation impossible. [*Mahaney, supra* at 495.]

The majority would hold that if they can plausibly posit the existence of two "objects," then these "objects" have no necessary connection. This is contrary to the meaning of the phrase as used by the *Mahaney* Court. More importantly, it confuses the means used to accomplish a general object with the object itself.

Our Supreme Court "has long and consistently said that art 4, § 24, and similar 'one object' provisions in earlier constitutions, are to be construed reasonably 'and not in so narrow and technical a sense as unnecessarily to embarrass legislation.'" *Kuhn v Dep't of Treasury,* 384 Mich 378, 387; 183 NW2d 796 (1971) (citations omitted). The majority refuses to acknowledge the import of this holding, even though citing it approvingly, by immersing itself in irrelevant procedural minutiae that does not pertain to the title-object analysis. The general

legislative intent as expressed in the Act is the only appropriate focus of a title-object inquiry. Simply stated, a court should endeavor to discern a unity of purpose and only when such cannot be found declare the Act invalid. To do otherwise is unnecessarily to embarrass legislation. The majority's position runs contrary to the appropriate deference to the Legislature that has characterized judicial review in this state. *Rohan, supra.*

In the case at bar, it is unquestionable, I believe, that the general purpose or object of the Act is to formulate an appropriate legislative response to the issue of assisted suicide. That there would be different provisions carrying forward this aim not only is proper but is altogether routine and expected when the Legislature does its work.

The provisional criminalization of assisted suicide, while the Commission on Death and Dying took testimony and made recommendations regarding a long-term solution, was intended to allow the issue to be addressed in an atmosphere conducive to calm deliberation. This method of assisting the commission is consistent with the object of the legislation. The Act, therefore, "is confined to the means supposed to be important to the end indicated," *Mahaney, supra* at 496, and merely "authorize[s] the doing of all things which may fairly be regarded as in furtherance of the general object of the enactment." *Kent Co, ex rel Bd of Supervisors of Kent Co v Reed,* 243 Mich 120, 123; 219 NW 656 (1928). The Act does not violate the title-object clause of art 4, § 24.[1]

---

[1] Although acknowledged as "certainly not controlling," *ante,* at 203, the majority cites the opinions of counsel for the House Judiciary Committee and the House Legislative Service Bureau that the Act violates the title-object clause. The majority feels that such opinions buttress their conclusion that the Act is unconstitutional. To so hold requires that one assume that upon reading and considering the advice from their staff the members of the Legislature decided to act

Neither does the Act violate the change of purpose clause of art 4, § 24.[2] The clause states:

> No bill shall be altered or amended on its passage through either house so as to change its original purpose as determined by its total content and not alone by its title.

A related provision (the "five-day rule"), found in Const 1963, art 4, § 26, states:

> No bill shall be passed or become a law at any regular session of the legislature until it has been printed or reproduced and in the possession of each house for at least five days.

In *Anderson v Oakland Co Clerk,* 419 Mich 313, 329-330; 353 NW2d 448 (1984), our Supreme Court, discussing the change of purpose clause and the five-day rule, stated:

> These are not recent provisions. A long history underscores an intent through these requirements to preclude last-minute, hasty legislation and to provide notice to the public of legislation under consideration irrespective of legislative merit.
>
> The five-day rule and the change of purpose provision were contained in the same article and section of the Constitution of 1908. Const 1908, art 5, § 22. It is clear that the function of the change of purpose provision, both in the Constitution of 1908 and as modified in the Constitution of 1963, is to fulfill the command of the five-day rule.

in violation of their oaths to comply with the Constitution. This is an impermissible assumption. Rather, the assumption should be that, expressly alerted to a constitutional issue, they considered it and found that acting in the way they did was constitutional. *Marbury v Madison,* 5 US (1 Cranch) 137, 179-180 (1803).

[2] Though not discussed in the majority opinion, I briefly discuss the issue of the change of purpose clause because it was decided in the three lower court opinions under review.

The opponents of the statute assert that inclusion of the temporary criminalization provision violated the change of purpose clause. However, as I have earlier indicated, there was only one purpose served by all provisions, and thus there is no violation of the change of purpose clause of art 4, § 24.

Furthermore, even if 1992 PA 270 violated the change of purpose clause, the entire Act was amended and reenacted as 1993 PA 3. An amendatory act by its nature supersedes its predecessor and replaces it. *Lahti v Fosterling,* 357 Mich 578, 587-588; 99 NW2d 490 (1959). Because 1993 PA 3 has at all times included both the criminalization and study commission provisions, and because 1993 PA 3 is the only relevant act, the change of purpose clause was not violated.

With regard to the five-day rule, the legislative history of the Act, recounted in the majority opinion, shows that the criminalization provision, in what became 1992 PA 270, was added on November 24, 1992, more than five days before passage on December 3, 1992. Therefore, I would hold that 1992 PA 270 complied with the requirements of the five-day rule. The Senate bill that became 1993 PA 3 was introduced on January 26, 1993, at which time it contained the study provisions and the temporary criminalization provision. It was enacted on February 25, 1993. Accordingly, I would hold that 1993 PA 3 also complied with the five-day rule.

As noted at the outset, I concur with Judge Fitzgerald's substantive due process analysis. However, I dissent with respect to Const 1963, art 4, § 24. I would reverse on that basis in Docket Nos. 164963 and 172399, and would affirm the analysis of art 4, § 24 in Docket No. 171056.