Steffen, C. J.,
concurring:
I concur in the result reached by the majority, but consider it necessary to comment on our dissenting colleague’s opinion.
I would first note, prefatorily, that I view Justice Springer’s dissent with more than a small degree of approbation because he again addresses this most difficult and excruciating subject of termination of parental rights with a concern and sensitivity that reflects a commendable ongoing regard for this most vital and precious interest of parents in the right to enjoy life with their children. Although I find it necessary to disagree with my colleague’s positional outcome regarding the instant case, I consider it important to again be reminded that we are not merely disposing of another case on appeal. We are asked to carefully and respectfully act as a final safeguard against an erroneous determination in the lower court that permanently severs the tie between parent and child — a fate that most of us who are blessed with children would consider far worse than our own death.
I am unaware of the number of termination cases that are finalized in the district courts without appeal. It seems safe to assume, however, that virtually every such case we see on appeal evinces at least some degree of parental love and interest concerning a child or children who are on the brink of extinction as far as their appealing parents are concerned. As a practical matter, we are the parents’ last source of hope for keeping the family alive. I thus agree with Justice Springer that this court must review these tragic cases with the greatest degree of diligence and concern — a premise recognized with an element of trepidation given the enormous caseload burdening this court.
Our dissenting colleague, it seems to me, speaks too categorically when he suggests that “the poor, sick and powerless are almost routinely being taken from their natural parents and per *1305 manently given to more talented parents.” Justice Springer cites no authority for this assertion and I genuinely hope that he could not do so. Impoverished parents can be just as unfit as wealthy parents, but I must admit that poor parents may often suffer terminations where those who can afford timely counsel and supply more favorable home conditions will not. I would therefore agree that the impoverished, downtrodden and generally more vulnerable parents should receive at least the same level of social welfare concern and judicial scrutiny and solicitude as parents who enjoy the financial means to marshal a vigorous and timely defense of their rights as parents. In other words, “equal justice under law” must have special meaning in these types of cases, notwithstanding the realization that some parents are inherently disadvantaged by various handicaps not of their own making, but which nevertheless can tragically impact the lives of their children.
Unfortunately, these cases often present the courts with the Hobson’s choice of either preserving parental rights at the expense of the children or sacrificing the parents in order to salvage the lives and futures of the children. Where it has been patiently and responsibly determined that both interests cannot be preserved without extensive injury to the one or the other, our Legislature has determined, and so must we, that the lives and the best interests of the children must take precedence. However, that is not to say in the least that if the poor, the sick and the powerless can be replaced as parents by those who would be “better” or more “talented,” our law would support the state in doing so. The very thought defies decency and reason, and in any event would be a stark violation of the Constitution.
Turning now to the instant case, it is true that we are faced with loving parents who are mentally disadvantaged. As our colleague has so effectively noted, this alone must give us serious cause for concern, for this nation has a laudable public policy favoring affirmative measures to assist our handicapped citizens in the pursuit of meaningful, quality lives. See McKay v. Bergstedt, 106 Nev. 808, 825-28, 801 P.2d 617, 628-30 (1990).
However, when it comes to an evaluation of parental fitness or neglect, as the majority opinion notes, the courts are under statutory mandate, NRS 128.106, to consider emotional and mental illness or mental deficiency of the parents where it adversely impacts the physical or psychological needs of the children over extended periods of time.
Unfortunately, mental handicaps may produce conditions that are inconsistent with functional, healthy home environments for children. Although fault is absent, the impact on the children is just as great as if fault were present. But I note at the outset of my *1306 evaluation of the facts that this is a most unfortunate case— indeed, unfortunate to the extreme. Even at this late, late date, this is a very close and difficult case.
Tragically, in affirming the district court’s decision to forever deprive these parents of their children and leave them with no more rights concerning the children than strangers off the street, I am convinced that we are sacrificing basically good and well-intentioned parents to a cumbersome, overloaded system that has managed to keep the children from their parents for over seven years. The one child, Alan Everett Bush, was removed from the parental home at approximately one and one-half years of age, and the second child, Frisco Lou Bush, taken from the home at the same time, was a ten-month-old infant. The children have been living in a foster home since 1990, and the foster parents with whom they have bonded want to adopt them. This is essentially the only home and family these children know.
In reading this record from cover to cover, I am left with an abiding belief that these “mentally deficient” parents are not sufficiently “deficient” to render them incapable of being fit and caring parents. Moreover, in reading the testimony of the State’s witnesses, I shudder at the amount of conjecture and speculative “forecasting” I saw there. Aside from a fearsome amount of “educated guesses” drawn from factual patterns that are far from established or egregious (or, for that matter, perhaps not all that far from normal), jurisdictional grounds were found to exist in the form of parental unsuitability and failure of parental adjustment. If we were reviewing this appeal seasonably, I would reject these findings.
The record reveals that for a period of time there were instances of argument between the parents in front of the children. There is meager evidence of a somewhat violent episode. Mr. Bush also made the mistake of impetuously purchasing a television set and stereo that the family could not afford (like how many other millions of parents across the country). There was also equivocal and conflicting evidence that at least on occasion, Mr. and Mrs. Bush failed to keep a clean apartment. The Bushes were also disparaged by a child development expert for their low income, their housing and their lack of transportation. Indeed, this expert found the Bushes lacking in nurturence and bonding with the children, a rather remarkable observation given the fact these parents had been restricted to such scant and unnatural visitation (one hour per month at the agency over an extended period of time) with their children. The Bushes were also found wanting in being “resistive” to some of the services offered by various agencies, and for not completing all of their programmed activities.
*1307 Despite the list of less than compelling negatives, including the fact that the children required special education and medication, these parents would ride their bicycles several miles to visit their children and made substantial attempts to abide by agency programs and directions which they believed were designed to effectuate a reunification with their children. The record frankly causes me to wonder about the extent to which these parents were ever intended to realize a reunion with Alan and Frisco. As counsel for the Bushes noted, it appears that his clients were doomed primarily because of their mental deficiencies, and my reading of their testimony leaves me with gnawing doubts about the accuracy of the evaluations on this critical point.
Notwithstanding the foregoing, I concur in the result reached by the majority because it appears to me that under the tragic facts of this case, we must resolve doubts as to whether jurisdictional grounds were demonstrated by clear and convincing evidence in favor of the children. I reach this conclusion advisedly, however, knowing that such a resolution may be viewed as an infringement of the Bushes’ constitutional rights. It is clear, however, that the Legislature has made the best interests of the children paramount in these types of proceedings, and I am convinced that at this late date, it would be extremely traumatic for the two boys to either be again placed in limbo or be torn from the arms and love of the only parents that they now truly know.
In studying this record, I was painfully reminded once again that we must find some means of expediting these matters so that tragedies such as the one before us may be avoided. However, I emphasize this without criticism of the lower court or the various agency workers involved over the agonizing history of this case. Resources are scarce, and social services personnel are limited in what they can do given the extent of their caseloads. Nevertheless, we are discussing the devolution and destruction of families, and we can no more afford to impose a “death sentence” on undeserving parents than we can afford to impose capital punishment on an innocent criminal defendant.
For the reasons noted above, I concur with the result reached by the majority, but with great respect for the concerns expressed in the dissent.